# VILAS v. CITY OF MANILA.

# TRIGAS v. SAME.

# AGUADO v. SAME.

ERROR TO AND APPEALS FROM THE SUPREME COURT OF THE PHILIPPINE ISLANDS.

Nos. 53, 54, 207.   Argued February 24, 27, 1911.—Decided April 3, 1911.

Even if there is no remedy adequate to the collection of a claim against a governmental subdivision when reduced to judgment, a plaintiff having a valid claim is entitled to maintain an action thereon and reduce it to judgment.

Where the case turned below on the consequence of a change in sovereignty by reason of the cession of the Philippine Islands, the construction of the treaty with Spain of 1898 is involved, and this court has jurisdiction of an appeal from the Supreme Court of the Philip-

pine Islands under § 10 of the act of July 1, 1902, c. 1369, 32 Stat. 691, 695.

While military occupation or territorial cession may work a suspension of the governmental functions of municipal corporations, such occupation or cession does not result in their dissolution.

While there is a total abrogation of the former political relations of inhabitants of ceded territory, and an abrogation of laws in conflict with the political character of the substituted sovereign, the great body of municipal law regulating private and domestic rights continues in force until abrogated or changed by the new ruler.

Although the United States might have extinguished every municipality in the territory ceded by Spain under the treaty of 1898, it will not, in view of the practice of nations to the contrary, be presumed to have done so.

The legal entity of the city of Manila survived both its military occupation by, and its cession to, the United States; and, as in law, the present city as the successor of the former city, is entitled to the property rights of its predecessor, it is also subject to its liabilities.

The cession in the treaty of 1898 of all the public property of Spain in the Philippine Islands did not include property belonging to municipalities, and the agreement against impairment of property and private property rights in that treaty applied to the property of municipalities and claims against municipalities.

One supplying goods to a municipality does so, in the absence of specific provision, on its general faith and credit, and not as against special funds in its possession; and even if such goods are supplied for a purpose for which the special funds are held no specific lien is created thereon.

THE facts, which involve the liability of the present city of Manila in the Philippine Islands for claims against the city of Manila as it existed prior to the cession under the treaty of 1898, are stated in the opinion.

Mr. Frederic R. Coudert and Mr. Howard Thayer Kingsbury, with whom Mr. Paul Fuller and Mr. Harry Weston Van Dyke were on the brief, for plaintiff in error and appellants:

The outstanding obligations of the city of Manila were not impaired by the change of sovereignty, but were pre-

served by the treaty and expressly recognized by the United States Government.

A municipal .corporation is not only a governmental subdivision but also an association of the members of a particular community for the administration of their local business and affairs in matters largely outside of the sphere of government as such.

As to the distinction between sovereign rights of government and corporate capacity, see *South Carolina* v. *United States*, 199 U. S. 437, 462; *Lloyd* v. *Mayor*, 5 N. Y. 369, 374; *Western Fund Society* v. *Philadelphia*, 31 Pa. St. 175.

A municipality is not a sovereignty. *Metropolitan Ry. Co.* v. *District of Columbia*, 132 U. S. 1, 9; Merryweather Claim, Magoon on the Law of Civil Government under Military Occupation, 407, 414; see also Magoon on Civil Government, 457–460; 22 Ops. Att. Gen. 526.

After the cession of California it was held by this court that the Pueblo of San Francisco which had existed as a municipal organization prior to the cession, continued to exist as such corporation in spite of the change of sovereignty and that such change of sovereignty left its property rights and obligations unimpaired. See *Townsend* v. *Greeley,* 5 Wall. 326; *Merryman* v. *Bourne*, 9 Wall. 592; *Moore* v. *Steinbach*, 127 U. S. 70; *Los Angeles Milling Co.* v. *Los Angeles*, 217 U. S. 217; *Smith* v. *Morse*, 2 California, 524; *Cohas* v. *Raisin*, 3 California, 443; *Hart* v. *Burnett*, 15 California, 530; and as to effect of Civil War, see *New Orleans* v. *Steamship Co.*, 20 Wall. 387.

The city of Manila, as at present constituted, is the successor of the city of Manila as existing under Spanish sovereignty, in respect to both its rights and obligations, and is therefore liable for the debts of the municipality which were outstanding at the time of the cession. *Mobile* v. *Watson*, 116 U. S. 289; *Shapleigh* v. *San Angelo*, 167 U. S. 646; and see *Broughton* v. *Pensacola*, 93 U. S. 266;

*Mt. Pleasant* v. *Beckwith,* 100 U. S. 514; *Mobile* v. *Watson,* 116 U. S. 289; *Comanche County* v. *Lewis,* 133 U. S. 198; *Van Hoffman* v. *City of Quincy,* 4 Wall. 535; *Girard* v. *Philadelphia,* 7 Wall. 1; *Barnes* v. *District of Columbia,* 91 U. S. 540; *New Orleans* v. *Clark,* 95 U. S. 644; *Meriwether* v. *Garrett,* 102 U. S. 472; *New Orleans* v. *Morris,* 105 U. S. 600; *Amy* v. *Watertown,* 130 U. S. 301; *Metropolitan Ry. Co.* v. *District of Columbia,* 132 U. S. 1; *District of Columbia* v. *Woodbury,* 136 U. S. 450.

The municipality of Manila did not disappear as a municipal government entity upon the capture of the city, but continued to exist and was recognized as so continuing by the capitulation, the general orders of the military authorities, the treaty and the President's instructions to the commission. Gen. Orders No. 4 of August 15, 1898. The protocols of the treaty show that the distinction between sovereign indebtedness and local obligations was recognized throughout the negotiations. Sen. Doc. 62, 55th Cong., 3d Sess., p. 261.

The claims of its own citizens or subjects which each Government relinquished, were those "against the other Government." Treaty, Art. VIII; 23 Op. Atty. Gen. 181, 190; Taylor's Int. Pub. Law, §§ 165, 168.

Plaintiff's claims are "property" within the meaning of the treaty. *Soulard* v. *United States,* 4 Pet. 511; *United States* v. *Reynes,* 9 How. 127; *O'Reilly* v. *Brooke,* 209 U. S. 45, distinguished.

The juristic personality of municipal corporations and their liability to suit were recognized and established by the Roman law and the Spanish law, both ancient and modern. See Digest of Justinian, Lib. III, Tit. IV, 1, 7; Ulpian on the Edict, 10; *Ibid.,* 1; 8 Javolenus, extracts from Cassius, 15; Monro's Translations, Vol. 1, p. 174; Savigny on Jural Relations, translated by Rattigan, §§ 86 *et seq.* The same doctrine is declared in the early Spanish codes. Partida Third, Title II, Law XIII; No-

visima Recopilacion, Book VII, Title XX, Law II; Laws of the Indies, Book IV, Title XI, Law 1; Spanish Laws Codified in 1877, Arts. 1, 30; Alcubilla's Diccionario de la Administracion Española, Vol. 1, pp. 839–863, sub. tit. Ayuntamientos; Alcubilla, Vol. 1, p. 872; Vol. 3, pp. 1036–1038.

The plaintiffs are entitled to the remedies of judgment and execution for the enforcement of their claims. *New Orleans* v. *Morris*, 105 U. S. 600; *Seibert* v. *Lewis*, 122 U. S. 284; *Memphis* v. *United States*, 97 U. S. 293; *Riggs* v. *Johnson County*, 6 Wall. 193; *Knox County* v. *Aspinwall*, 24 How. 376; *Workman* v. *New York*, 179 U. S. 552, 565.

The city of Manila holds the Carriedo Fund as a trustee and such fund is liable for obligations incurred in the administration of the Carriedo Water Works. Rep. of Phil. Com. for 1900, Vol. 3, p. 49; 1 Ops. Atty. Gen. P. I. 319, 323, 450, 452, 543; Dillon's Mun. Corp., 4th ed., §§ 19–21; *Vidal* v. *Girard*, 2 How. 127; *Girard* v. *Philadelphia*, 7 Wall. 1; *United States* v. *Railroad Co.*, 17 Wall. 322; *Commissioners* v. *Lucas*, 93 U. S. 108, 115; *Hunter* v. *Pittsburgh*, 207 U. S. 161, 179; *Philadelphia* v. *Fox*, 64 Pa. St. 169, 182; *People* v. *Hurlbut*, 9 Am. Rep. 108.

A trustee may incur liabilities or make expenditures for the protection of the trust estate, and, *a fortiori*, for the performance of the trust itself, and he may indemnify himself by recourse to the trust property, upon which he has a lien for this purpose. *New* v. *Nicoll*, 73 N. Y. 127; *Noyes* v. *Blakeman*, 6 N. Y. 567, 580, and cases cited; *Van Slyke* v. *Bush*, 123 N. Y. 47.

*Mr. Paul Charlton*, with whom *Mr. Isaac Adams* was on the brief, for defendant in error and appellees:

As to what constitutes "property," as that word was used in Art. VIII of the treaty of Paris, see *O'Reilly* v. *Brooke*, 209 U. S. 45.

A contract for furnishing coal, or for collecting taxes

for one year, or for furnishing material or performing labor, all of which would be concluded, and all rights thereunder extinguished, by payment or by lapse of time, were clearly not such "property" as was in the mind of the commissioners who concluded the treaty of Paris. The treaty, especially as illuminated by the protocols, makes clear distinction between the relation which the United States was willing to assume toward the island of Cuba and its affairs, and that which it was willing to assume toward the Philippine Islands and their affairs.

The words "property" and "rights" there guaranteed were, specifically, those which related to the peaceful possession of property of all kinds.

The United States has scrupulously fulfilled the obligation it assumed in Arts. I and VII of the treaty with relation to its responsibility for obligations incurred during its occupation of Cuba, and in the settlement and adjudication of claims of its citizens for damages specified in said Art. VII. The Spanish Treaty Claims Commission was organized, has performed the functions of its creation, and has been dissolved; no claim which could rightfully arise under the obligation assumed in those articles of the treaty remains undetermined.

The city of Manila, as at present constituted, is not the successor of the city of Manila as existing under Spanish sovereignty in respect to both its rights and obligations, and is not liable for the debts of the municipality which were outstanding at the time of the cession.

At the time of the acquisition of sovereignty by the United States over the Philippine Islands, the inhabitants thereof had only such rights as were granted by the grace of the United States, and later, such as were secured to them under the treaty of Paris, and the Organic Act of July 1, 1902, and its amendments.

The juristic personality of municipal corporations and their liability to suit was not, as claimed by plaintiff,

recognized and established by the Roman law and the Spanish law, both ancient and modern. See Dictionary of Alcubilla, supplement of 1894.

The plaintiffs are not entitled to the remedies of judgment and execution for the enforcement of their claims. *Hoey* v. *Baldwin*, 1 Phil. Rep. 551.

A municipality has only such implied powers as are necessary to effectuate the specific grants of its charter, and as the charter of the city of Manila neither contains any authority to assume the obligations of the Ayuntamiento of Manila, nor any words which, by necessary legal implication, could be held to include such authority or obligation, no right existed in favor of plaintiffs in error which the city of Manila had either authority or obligation to satisfy.

The city of Manila does not hold the Carriedo Fund as a trustee and such fund is liable for obligations incurred in the administration of the Carriedo Water Works.

Under the facts in this case and as it is impossible to separate the moneys or property captured into classes referable to their sources, there can be no specific responsive liability to the claims of plaintiffs.

MR. JUSTICE LURTON delivered the opinion of the court.

The plaintiffs in error, who were plaintiffs below, are creditors of the city of Manila as it existed before the cession of the Philippine Islands to the United States by the treaty of Paris, December 10, 1898. Upon the theory that the city under its present charter from the government of the Philippine Islands is the same juristic person and liable upon the obligations of the old city, these actions were brought against it. The Supreme Court of the Philippine Islands denied relief, holding that the present municipality is a totally different corporate entity, and in no way liable for the debts of the Spanish municipality.

The fundamental question is whether, notwithstanding the cession of the Philippine Islands to the United States, followed by a reincorporation of the city, the present municipality is liable for the obligations of the city incurred prior to the cession to the United States.

We shall confine ourselves to the question whether the plaintiffs in error are entitled to judgments against the city upon their several claims. Whether there is a remedy adequate to the collection when reduced to judgment is not presented by the record. But whether there is or is not a remedy, affords no reason why the plaintiffs in error may not reduce their claims to judgment. *Mt. Pleasant* v. *Beckwith*, 100 U. S. 514, 530. The city confessedly may be sued under its existing charter, and that implies at least a right to judgment if they establish their demands.

The city as now incorporated has succeeded to all of the property rights of the old city and to the right to enforce all of its causes of action. There is identity of purpose between the Spanish and American charters and substantial identity of municipal powers. The area and the inhabitants incorporated are substantially the same. But for the change of sovereignty which has occurred under the treaty of Paris, the question of the liability of the city under its new charter for the debts of the old city would seem to be of easy solution. The principal question would therefore seem to be the legal consequence of the cession referred to upon the property rights and civil obligations of the city incurred before the cession. And so the question was made to turn in the court below upon the consequence of a change in sovereignty and a reincorporation of the city by the substituted sovereignty.

This disposes of the question of the jurisdiction of this court grounded upon the absence from the petition of the plaintiffs of any distinct claim under the treaty of Paris, since under § 10 of the Philippine Organic Act

of July 1, 1902, this court is given jurisdiction to review any final decree or judgment of the Supreme Court of the Philippine Islands where any treaty of the United States "is involved." That treaty was necessarily "involved," since neither the court below nor this court can determine the continuity of the municipality nor the liability of the city as it now exists for the obligation of the old city, without considering the effect of the change of sovereignty resulting from that treaty. See *Reavis* v. *Fianza*, 215 U. S. 16, 22.

The historical continuity of a municipality embracing the inhabitants of the territory now occupied by the city of Manila is impressive. Before the conquest of the Philippine Islands by Spain, Manila existed. The Spaniards found on the spot now occupied a populous and fortified community of Moros. In 1571 they occupied what was then and is now known as Manila, and established it as a municipal corporation. In 1574 there was conferred upon it the title of "Illustrious and ever loyal city of Manila." From time to time there occurred amendments, and, on January 19, 1894, there was a reorganization of the city government under a royal decree of that date. Under that charter there was power to incur debts for municipal purposes and power to sue and be sued. The obligations here in suit were incurred under the charter referred to, and are obviously obligations strictly within the provision of the municipal power. To pay judgments upon such debts it was the duty of the Ayuntamiento of Manila, which was the corporate name of the old city, to make provision in its budget.

The contention that the liability of the city upon such obligations was destroyed by a mere change of sovereignty is obviously one which is without a shadow of moral force, and, if true, must result from settled principles of rigid law. While the contracts from which the claims in suit resulted were in progress, war between the United

States and Spain ensued. On August 13, 1898, the city was occupied by the forces of this Government and its affairs conducted by military authority. On July 31, 1901, the present incorporating act was passed, and the city since that time has been an autonomous municipality. The charter in force is act 183 of the Philippine Commission and now may be found as chapters 68 to 75 of the Compiled Acts of the Philippine Commission. The first section of the charter of 1901 reads as follows:

"The inhabitants of the city of Manila, residing within the territory described in section 2 of this act, are hereby constituted a municipality, which shall be known as the city of Manila and by that name shall have perpetual succession, and shall possess all the rights of property herein granted or heretofore enjoyed and possessed by the city of Manila as organized under Spanish sovereignty."

The boundaries described in § 2 include substantially the area and inhabitants which had theretofore constituted the old city.

By § 4 of the same act the government of the city was invested in a municipal board.

Section 16 grants certain legislative powers to the board, and provides that it shall "take possession of all lands, buildings, offices, books, papers, records, moneys, credits, securities, assets, accounts, or other property or rights belonging to the former city of Manila or pertaining to the business or interests thereof, and, subject to the provisions herein set forth, shall have control of all its property except the building known as the Ayuntamiento, provision for the occupation and control of which is made in § 15 of this act; shall collect taxes and other revenues, and apply the same in accordance with appropriations, as hereinbefore provided, to the payment of the municipal expenses; shall supervise and control the discharge of official duties by subordinates; shall institute judicial proceedings to recover property and

funds of the city wherever found or otherwise to protect
the interests of the city, and shall defend all suits against
the city," etc.

Section 69 of the charter expressly preserved "all city
ordinances and orders in force at the time of the passage
of this act and not inconsistent herewith," until modified
or repealed by ordinances passed under this act.

Section 72 is the repealing clause, and provides for the
repeal of "all acts, orders and regulations" which are in-
consistent with the provisions of the act.

The charter contains no reference to the obligations
or contracts of the old city.

If we understand the argument against the liability
here asserted, it proceeds mainly upon the theory that
inasmuch as the predecessor of the present city, the Ayunt-
amiento of Manila, was a corporate entity created by the
Spanish government, when the sovereignty of Spain in the
islands was terminated by the treaty of cession, if not by
the capitulation of August 13, 1908, the municipality
*ipso facto* disappeared for all purposes. This conclusion
is reached upon the supposed analogy to the doctrine
of principal and agent, the death of the principal ending
the agency. So complete is the supposed death and an-
nihilation of a municipal entity by extinction of sover-
eignty of the creating State that it was said in one of the
opinions below that all of the public property of Manila
passed to the United States, "for a consideration, which
was paid," and that the United States was therefore
justified in creating an absolutely new municipality and
endowing it with all of the assets of the defunct city, free
from any obligation to the creditors of that city. And so
the matter was dismissed in the *Trigas Case* by the Court
of First Instance, by the suggestion that "the plaintiff
may have a claim against the crown of Spain, which has
received from the United States payment for that done
by the plaintiff."

We are unable to agree with the argument. It loses sight of the dual character of municipal corporations. They exercise powers which are governmental and powers which are of a private or business character. In the one character a municipal corporation is a governmental subdivision, and for that purpose exercises by delegation a part of the sovereignty of the State. In the other character it is a mere legal entity or juristic person. In the latter character it stands for the community in the administration of local affairs wholly beyond the sphere of the public purposes for which its governmental powers are conferred.

The distinction is observed in *South Carolina* v. *United States*, 199 U. S. 437, 461, where *Lloyd* v. *Mayor of New York*, 5 N. Y. 369, 374, and *Western Savings Society* v. *Philadelphia*, 31 Pa. St. 175, are cited and approved. In *Lloyd* v. *Mayor of New York, supra*, it is said:

"The corporation of the city of New York possesses two kinds of power, one governmental and public, and, to the extent they are held and exercised, is clothed with sovereignty, the other private, and to the extent they are held and exercised, is a legal individual. The former are given and used for public purposes, the latter for private purposes. While in the exercise of the former, the corporation is a municipal government, and while in the exercise of the latter, is a corporate legal individual."

See also Dillon Mun. Corp. 66, 4th ed.; *City of Petersburg* v. *Applegarth's Administrator*, 26 Gratt. 321, 343; and *Oliver* v. *Worcester*, 102 Massachusetts, 489.

In view of the dual character of municipal corporations there is no public reason for presuming their total dissolution as a mere consequence of military occupation or territorial cession. The suspension of such governmental functions as are obviously incompatible with the new political relations thus brought about may be presumed.

But no such implication may be reasonably indulged beyond that result.

Such a conclusion is in harmony with the settled principles of public law as declared by this and other courts and expounded by the text books upon the laws of war and international law. Taylor International Public Law, § 578.

That there is a total abrogation of the former political relations of the inhabitants of the ceded region is obvious. That all laws theretofore in force which are in conflict with the political character, constitution or institutions of the substituted sovereign lose their force, is also plain. *Alvarez .v. United States,* 216 U. S. 167. But it is equally settled in the same public law that that great body of municipal law which regulates private and domestic rights continues in force until abrogated or changed by the new ruler. In *Chicago, Rock Island & Pacific Railway Co.* v. *McGlinn,* 114 U. S. 542, 546, it was said:

"It is a general rule of public law, recognized and acted. upon by the United States, that whenever political jurisdiction and legislative power over any territory are transferred from one nation or sovereign to another, the municipal laws of the country, that is, laws which are intended for the protection of private rights, continue in force until abrogated or changed by the new government or sovereign. By the cession public property passes from one government to the other, but private property remains as before, and with it those municipal laws which are designed to secure its peaceful use and enjoyment. As a matter of course, all laws, ordinances, and regulations in conflict with the political character, institutions and constitution of the new government are at once displaced. Thus, upon a cession of political jurisdiction and legislative power—and the latter is involved in the former—to the United States, the laws of the country in support of an established religion, or abridging the freedom of the

press, or authorizing cruel and unusual punishments, and the like, would at once cease to be of obligatory force without any declaration to that effect; and the laws of the country on other subjects would necessarily be superseded by existing laws of the new government upon the same matters. But with respect to other laws affecting the possession, use and transfer of property, and designed to secure good order and peace in the community, and promote its health and prosperity, which are strictly of a municipal character, the rule is general, that a change of government leaves them in force until, by direct action of the new government, they are altered or repealed."

The above language was quoted with approval in *Downes* v. *Bidwell*, 182 U. S. 244, 298.

That the United States might, by virtue of its situation under a treaty ceding full title, have utterly extinguished every municipality which it found in existence in the Philippine Islands may be conceded. That it did so in view of the practice of nations to the contrary is not to be presumed and can only be established by cogent evidence.

That during military occupation the affairs of the city were in a large part administered by officials put in place by military order did not operate to dissolve the corporation or relieve it from liability upon obligations incurred before the occupation nor those created for municipal purposes by the administrators of its affairs while its old officials were displaced. *New Orleans* v. *Steamship Co.*, 20 Wall. 387, 394. During that occupation and military administration the business of the city was carried on as usual. Taxes were assessed and taxes collected and expended for local purposes, and many of the officials carrying on the government were those found in office when the city was occupied. The continuity of the corporate city was not inconsistent with military occupation or the constitution or institutions of the occupying power. This

is made evident by the occurrences at the time of capitulation. Thus the articles of capitulation concluded in these words: "This city, its inhabitants . . . and its private property of all descriptions are placed under the special safeguard of the faith and honor of the American Army." This was quoted in President McKinley's instructions of April 7, 1900, to the Philippine Commission, and touching this he said: "I believe that this pledge has been faithfully kept." And the commission was directed to labor for the full performance of this obligation. This instruction was in line with and in fulfillment of the eighth article of the treaty of Paris of December 10, 1898. Under the third article of that treaty the archipelago known as the Philippine Islands was ceded to the United States, the latter agreeing to pay to Spain the sum of twenty million dollars. Under the first paragraph of the eighth article Spain relinquished to the United States "all buildings, wharves, barracks, forts, structures, public highways and other immovable property which, in conformity with law, belong to the public domain, and as such belong to the crown of Spain." It is under this clause, in connection with the clause agreeing to pay to Spain twenty million dollars for the cession of the Philippine group, that the contention that all of the public rights of the city of Manila were acquired by the United States, which country was therefore justified, as absolute owner, in granting the property rights so acquired to what is called the "absolutely new corporation," created thereafter. But the qualifying words touching property rights relinquished by Spain limit the relinquishment to "property which, in conformity with law, belongs to the public domain, and *as such belongs to the crown of Spain.*" It did not affect property which did not, in "conformity with law, belong to the crown of Spain." That it was not intended to apply to property which, "in conformity with law," belonged to the city of Manila as a municipal cor-

poration is clear. This is demonstrated by the second paragraph of the same article, which reads: And it is hereby declared that the relinquishment or cession, as the case may be, to which the preceding paragraph refers, cannot in any respect impair the property or rights which by law belong to the peaceful possession of property of all kinds, of provinces, municipalities, public or private establishments. . . . having legal capacity to acquire and possess property in the aforesaid territory renounced or ceded, or of private individuals. . . ." Thus the property and property rights of municipal corporations were protected and safeguarded precisely as were the property and property rights of individuals.

That the cession did not operate as an extinction or dissolution of corporations is herein recognized, for the stipulation against impairment of their property rights has this plain significance.

The conclusion we reach that the legal entity survived both the military occupation and the cession which followed finds support in the cases which hold that the Pueblos of San Francisco and Los Angeles, which existed as municipal organizations prior to the cession of California by Mexico, continued to exist with their community and property rights intact. *Cohas* v. *Raisin*, 3 California, 443; *Hart* v. *Burnett*, 15 California, 530; *Townsend* v. *Greeley*, 5 Wall. 326; *Merryman* v. *Bourne*, 9 Wall. 592, 602; *More* v. *Steinbach*, 127 U. S. 70; *Los Angeles Milling Co.* v. *Los Angeles*, 217 U. S. 217.

Was corporate identity and corporate liability extinguished as a necessary legal result of the new charter granted in 1901 by the Philippine Commission? The inhabitants of the old city are the incorporators of the new. There is substantially identity of area. There are some changes in the form of government and some changes in corporate powers and methods of administration. The new corporation is endowed with all of the property and

property rights of the old. It has the same power to sue and be sued which the former corporation had. There is not the slightest suggestion that the new corporation shall not. succeed to the contracts and obligations of the old corporation. Laying out of view any question of the constitutional guarantee against impairment of the obligation of contracts, there is, in the absence of express legislative declaration of a contrary purpose, no reason for supposing that the reincorporation of an old municipality is intended to permit an escape from the obligations of the old, to whose property and rights it has succeeded. The juristic identity of the corporation has been in no wise affected, and, in law, the present city is in every legal sense the successor of the old. As such it is entitled to the property and property rights of the predecessor corporation, and is, in law, subject to all of its liabilities. *Broughton* v. *Pensacola,* 93 U. S. 266; *Mount Pleasant* v. *Beckwith,* 100 U. S. 520; *Mobile* v. *Watson,* 116 U. S. 289; *Shapleigh* v. *San Angelo,* 167 U. S. 646, 655; *O'Connor* v. *Memphis,* 6 Lea, 730; *Colchester* v. *Seaber,* 3 Burrows, 1866, 1870, in which case, when a municipality became disabled to act and obtained a new charter, in an action upon an obligation of the old corporation, there was judgment for the creditor, Lord Mansfield saying: .

"Many corporations, for want of legal magistrates, have lost their activity, and obtained new charters. Maidstone, Radnor, Carmartben, and many more are in the same case with Colchester. And yet it has never been disputed but that the new charters revive and give activity to the old corporation; except, perhaps, in that case in Levinz, where the corporation had a new name; and even there the court made no doubt. · Where the question has arisen upon any remarkable metamorphosis, it has always been determined that they remain the same, as to debts and 'rights.'"

*Morris & Cummings* v. *State,* 63 Texas, 728, 730.

In *Shapleigh* v. *San Angelo, supra,* this court said in a similar case:

"The State's plenary power over its municipal corporations to change their organization, to modify their method of internal government, or to abolish them altogether, is not restricted by contracts entered into by the municipality with its creditors or with private parties. An absolute repeal of a municipal charter is therefore effectual so far as it abolishes the old corporate organization; but when the same or substantially the same inhabitants are erected into a new corporation, whether with extended or restricted territorial limits, such new corporation is treated as in law the successor of the old one, entitled to its property rights, and subject to its liabilities."

The cases of *Trigas* and *Vilas* went off upon demurrers, and no question of remedy arises here.

The appeal of Aguado is from a decree upon a final hearing denying him all relief.

That all three of the plaintiffs in error are entitled to proceed to judgment when they shall establish their several claims is obvious from what we have said. But in the *Aguado case* it is sought to establish his claim as a charge against certain property and funds held by the city as trustee, known as the Carriedo fund. In 1734 one Don Francisco Carriedo y Perodo bequeathed to the city a fund for the establishment of waterworks, to be kept as a separate fund and devoted to the erection and maintenance of the works. This fund was loyally kept and greatly increased and was enlarged by a special tax upon meat, devoted to that purpose, The works were finally completed in 1878, and have been since operated by the city, the income and special tax going to maintenance. Certain securities belonging to the fund are now held by the city, the income being applied to the operation of the works. Aguado took a contract to supply coal for the use of the

Carriedo works and made a deposit to guarantee the contract. When the city was occupied by the American army it was indebted to him for coal so supplied, as well as for the deposit so made. That the coal was bought for and used in the operation of the Carriedo works is not denied. But there is no evidence that the credit was given to the Carriedo Fund so held in trust under the will of Carriedo. The contract was made with the Ayuntamiento of Manila, just as all other contracts for city supplies or works were made. The contract not having been made with special reference to the liability of the fund held in trust by the city, but apparently upon the general credit of the city, we are not disposed to reverse the judgment of the court below, holding that the claim of Aguado did not constitute a charge upon the Carriedo fund.

Aguado is, nevertheless, entitled to a judgment. The designation of the city in the petition as trustee may be regarded as descriptive. The debt having been incurred by the city, it must be regarded as a city liability. *Taylor* v. *Davis*, 110 U. S. 330, 336.

Our conclusion is that the decree in the *Aguado case* must be reversed and the case remanded, with direction to render judgment and such other relief as may seem in conformity with law. The judgments in the *Trigas* and *Vilas cases* will be reversed and the cases remanded with direction to overrule the respective demurrers, and for such other action as may be consistent with law, and consistent with this opinion.