UNITED STATES, on Petition of ALBRO, ex rel. COOK et al. v. KARNUTH, United States Director of Immigration, et al.

Circuit Court of Appeals, Second Circuit. March 5, 1928.

No. 274.

1. Aliens ⊕=44—Commissioner of immigration may not make regulations beyond power delegated to him (8 USCA § 102).

Commissioner of Immigration may not make regulations to enforce the Immigration Act which are beyond the power delegated by Congress to him by 8 USCA § 102.

2. Treaties ⊕=11—On irreconcilable conflict between act of Congress and treaty, one last in date prevails.

An act of Congress may supersede a prior treaty, and, in case of irreconcilable conflict between act of Congress and any treaty, the one last in date prevails.

3. Aliens ⊕=40—Courts, in construing Immigration Act should conform, if possible, to treaty providing for free temporary passage across Canadian border.

In construing Immigration Act, courts, if possible, should conform to the provisions of the Jay Treaty of 1794 (8 Stat. 116), providing for free temporary passage across Canadian border.

4. Treaties ⊕=5—Jay Treaty providing for free temporary passage across Canadian border, was not terminated by War of 1812.

Jay Treaty of 1794 (8 Stat. 116), providing right of free temporary passage across Canadian border, was not terminated by War of 1812.

5. Aliens ⊕=40—Immigration laws include conventions and treaties relating thereto.

Immigration laws include all conventions and treaties of United States relating to immigration, exclusion, or expulsion of aliens.

6. Treaties ⊕=7—Treaty provisions must be construed to conform to accepted principles of international law and to carry out apparent intention of contracting parties.

Treaty provisions of a country must be construed so as to best conform to the principles of international law, and not in derogation of them, and should be liberally construed to carry out apparent intention of contracting parties to secure equality and reciprocity between them.

7. Treaties ⊕=8—Jay Treaty, providing temporary passage across Canadian border, must be reasonably construed.

Jay Treaty of 1794 (8 Stat. 116), providing right of free temporary passage across Cana-

dian border, being maintained for benefit of all British subjects, should receive a reasonable construction, with a view to giving a fair operation to the whole.

**8. Aliens** ⊚⇒46—**British subjects residing in Canada had right to enter United States daily to work or seek employment; "immigrants"; "business" (Immigration Act 1924, § 3 [8 USCA § 203]).**

British subjects residing in Canada, one of whom was employed in United States and the other entering daily, seeking employment, *held* not "immigrants," within meaning of Immigration Act 1924, § 3 (8 USCA § 203), and were entitled to admission as temporary visitors for business purposes, in accordance with the provisions of the Jay Treaty of 1794 (8 Stat. 116): "business," as used therein, not being limited to trading and merchandising, but embracing everything by which a man can be employed.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Immigrant.]

Appeal from the District Court of the United States for the Western District of New York.

Habeas corpus by the United States, on petition of Preston M. Albro, on the relation of Mary Cook and another, against Arthur J. Karnuth, United States Director of Immigration, and another, to review an order of the Board of Special Inquiry excluding relators from United States. Order of dismissal, and relators appeal. Reversed.

Botsford, Mitchell, Albro & Weber, of Buffalo, N. Y. (Preston M. Albro, of Buffalo, N. Y., of counsel), for appellants.

Robert A. Reid, of Toronto, Canada, D. C. L. Barrister, amicus curiæ.

Richard H. Templeton, U. S. Atty., of Buffalo, N. Y. (Richard A. Grimm, Asst. U. S. Atty., of Buffalo, N. Y., of counsel), for appellees.

H. Ely Goldsmith, of New York City, Consultant in Immigration Matters, amicus curiæ.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge. Mary Cook, a British subject, and Antonio Danelon, a naturalized citizen of Canada and a British subject, sued out a writ of habeas corpus to review proceedings of the Board of Special Inquiry of the Immigration Service, which held that they should be refused admission to the United States because they had no unexpired Consular immigration visas, as required by the Immigration Act of 1924 (8 USCA §§ 166, 167, 179, 201–226), and pursuant to rule 86 promulgated by the Department of Labor.

Danelon worked at Niagara Falls, but lived in the Dominion of Canada. Mary Cook, residing in the Dominion of Canada and intending to remain there, crossed the border, seeking employment in the United States. They were arrested on December 1, 1927. The court below dismissed the writ of habeas corpus, sued out by them, because (a) they were persons entering the United States, one looking for employment, and the other solely to work, and each to return in the evening to an adjoining foreign country, and were not temporary visitors, but were immigrants; (b) they were not protected as British subjects by the Jay Treaty of 1794 (8 Stat. 116); and (c) in any event the Jay Treaty does not apply to British nationals of other than Canadian birth and classified by Order 86 as immigrants.

Immigration Act 1924 (§ 203, title 8, c. 6, USCA), provides that:

"When used in this subchapter the term 'immigrant' means any alien departing from any place outside of the United States destined for the United States, except * * * an alien visiting the United States temporarily as a tourist or temporarily for business or pleasure."

Section 102 of USCA, c. 6, tit. 8, provides that the commissioner having charge of the administration of the laws regulating the immigration of aliens into the United States shall make rules and regulations and prescribe such forms of bond, reports, entries, and other papers, and shall issue from time to time such instructions, not inconsistent with the law, as he shall deem best calculated for carrying out the provisions of this section and sections. Pursuant to that authority, the commission issued General Order No. 86 on April 1, 1927, effective July 1, 1927, reading:

"(1) Hereafter aliens residing in foreign contiguous countries and entering the United States to engage in existing employment or to secure employment in this country, will not be considered as visiting the United States temporarily as tourists or temporarily for business or pleasure under any provision of the immigration law which exempts visitors from complying with certain requirements thereof; that is they will be considered as aliens of the 'immigrant' class.

"(2) However, the following aliens of the said 'immigrant' class, residing in foreign contiguous countries and who are now enjoying the border crossing privilege, may continue so to enjoy upon the payment of head tax provided such head tax was assessable on aliens entering permanently at the

time of· original admission, and provided further, that they are not coming to seek employment."

[1] The commissioner may not make regulations to enforce the Immigration Act which are beyond the powers delegated by Congress to him by section 102. The Parthian (C. C. A.) 276 F. 903. If the commissioner had lawful authority to issue Order No. 86, it would prevent ·the relators crossing daily and classify them as immigrants. A question is presented as to whether these relators, domiciled in Canada, crossing, one for employment, and the other seeking employment, are immigrants within the meaning of the Immigration Act. Were they temporarily in the United States for business, and what privileges are accorded to them by rea-·son of the Jay Treaty of 1794?

In Moffit v. United States (C. C. A.) 128 F. 375, in considering the Immigration Act of March 3, 1891 (26 Stat. 1084), the court had under consideration the importation of aliens under contracts or agreements to perform labor, ·and, holding that it clearly related to immigration, said that immigrants meant persons removing into the country for the purpose of permanent residence. The court held that, in considering the penalty imposed by section 10 of the act (26 Stat. 1086) on the master of a vessel for neglecting to detain on his vessel any alien who may unlawfully come to the United States on such vessel, or to return him to the port from which he came, must be construed in the light of such purposes and limited in its application to cases of alien immigrants. The court said, referring to the Standard Dictionary, that the meaning of the word "immigrant," as there defined, applied to the word used in the statute in order to describe the intent of Congress, and approved the definition that "immigrant" meant a person who removes into a country for the purpose of permanent residence, or a person passing or removing into a country for the purpose of permanent residence. See, also, Ex parte Hoffman (C. C. A.) 179 F. 839; Taylor v. United States (C. C. A.) 152 F. 1.

Section 203, title 8, chapter 6, defines the term "immigrant" as meaning any alien departing from any place outside of the United States destined for the United States. In view of the common acceptation, or the definition, by standard dictionaries, of the term "immigrant," an alien destined for the United States must be deemed to have intended a change of his domicile and removal from the country of his domicile for the· purpose of permanent residence. See Webster's Dictionary; Century Dictionary. And Congress excepted aliens visiting the United States temporarily for business or pleasure.

The appellee contends that business does not include ordinary occupation, but refers rather to trading and merchandising. Business has been defined as a very comprehensive term, and embodies everything by which a person can be employed, and again, "that which occupies the time, attention, and labor of men for the purpose of livelihood or profit; but it is not necessary that it should be the sole occupation or employment. It embraces everything by which a man can be employed." Flint v. Stone-Tracy Co., 220 U. S. 107, 31 S. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312; 9 Corpus Juris, 1101; Goddard v. Chaffee, 2 Allen (84 Mass.) 395, . 79 Am. Dec. 796.

In United,States v. Michigan Central R. R. Co. (C. C.) 48 F. 365, the railroad company employed in its office in New York, near the Canadian border, a resident of Canada, who came daily to his work in the United States. It was sued, under the Contract Labor Law, for assisting and encouraging importation or migration of an alien, within the meaning of that law. Wallace, J., directing a judgment for the defendant, said:

"The several provisions of the act are directed against assisted immigrants, as well as those who prepay their transportation or encourage their migration or importation by previous contract. Blount was not an immigrant, because he did not come here intending to acquire a permanent or a temporary home. As he did not migrate here, the defendant did not encourage his 'migration.' He was not imported, nor did the defendant assist in his 'importation,' any more than he was exported, and assisted in his exportation, when he went home at night. It may be that such a case as this is within the mischief which the promoters of the law intended to remedy, but it is not within the ordinary import of the words of the statute. If every person who comes into this country migrates, or is imported, within the meaning of the statute, because he remains temporarily, and works here, the statute will reach many cases in which its application would be a manifest absurdity."

The Jay Treaty of ·1794 between the United States and Great Britain provides· the right of free temporary passage across· the Canadian border in article 3 (Treaty of Amity, Commerce, and Navigation, 1794). Article 3 provides:

"It is agreed that it shall at all times be free to His Majesty's subjects, and to the citizens of the United States, and also to the Indians dwelling on either· side of the said boundary line, freely to pass and repass by land or inland navigation, into the respective territories and countries of the two parties, on the continent of America (the country within the limits of the Hudson's Bay Company only excepted), and to navigate all the lakes, rivers and ·waters thereof, and freely to carry on trade and commerce with each other."

[2] By article 28 of that treaty it was provided that the first 10 articles of the treaty were to be permanent. In considering the intention of Congress, the terms of this treaty are pertinent. An act of Congress may supersede a prior treaty (The Cherokee Tobacco, 11 Wall. 616, 20 L. Ed. 227), and an irreconcilable conflict between the act of Congress and any treaty results in ·the last in date prevailing (Hijo v. United States, 194 U. S. 315, 24 S. Ct. 727, 48 L. Ed. 994). But the courts will be slow to assume that Congress intended to violate a treaty right. United States v. Mrs. Gue Lim, 176 U. S. 459, 20 S. Ct. 415, 44 L. Ed. 544; Chew Heong v. United States, 112 U. S. 536, 5 S. Ct. 255, 28 L. Ed. 770.

[3, 4] There is no question at bar as to the permanent immigration of aliens, nor have we questions of social welfare to our inhabitants which must be considered in the construction of this act of Congress. Where it is possible, in construing the statute, we should conform to the provisions of the treaty. United States v. 43 Gallons of Whisky, 108 U. S. 496, 2 S. Ct. 906, 27 L. Ed. 803; Ward v. Race Horse, 163 U. S. 504, 16 S. Ct. 1076, 41 L. Ed. 244. Nowhere in the Immigration Act do we find this right, accorded by the· treaty to Canadian citizens to pass and repass, which is allowed by the Jay Treaty, taken from them; certainly not by expressed intent. The treaty and the Immigration Act do not seem inconsistent, but are reconcilable. This treaty was a mutual border. crossing right, accorded to the parties thereto and for their own special interest. The treaty was not terminated by the War of 1812. Soc. for the Propagation of the Gospel in Foreign Parts v. Town of New Haven, 8 Wheat. 464, 5 L. Ed. 662; Woolsey, International Law (6th Ed.) 1897, p. 263; Moore's ˙Digest of International Law (1906) vol. 5, pp. 372, 383; U. S. ex rel. Diabo v. McCandless (D. C.) 18 F.(2d) 282.

[5, 6] The immigration laws have been deem-

ed to include all conventions and treaties of the United States relating to immigration, exclusion, or expulsion of aliens. Terlinden v. Ames, 184 U. S. 270, 22 S. Ct. 484, 46 L. Ed. 534. The treaty provisions of a country must be construed so as to best conform to the accepted principles of international law, and not in derogation of them. Vilas v. City of Manila, 220 U. S. 345, 31 S. Ct. 416, 55 L. Ed. 491. They should be liberally construed, so as to carry out the apparent intention of the contracting parties to secure equality and reciprocity between them. De Geofroy v. Riggs, 133 U. S. 258, 271, 10 S. Ct. 295, 33 L. Ed. 642; In re Ross, 140 U. S. 453, 475, 11 S. Ct. 897, 35 L. Ed. 581. Undoubtedly the plain intention of article 3 of the treaty and the explanatory article thereof was to give intercourse freely among the people of each ʼcountry on both sides of the line or international boundary. Such ˌcommercial and friendly intercourse together with the freedom of navigation and passage, is not inconsistent with the right of this nation to debar aliens from admission to this country.

The term "immigrant" has an entirely different meaning, and the immigration statute an entirely different purpose. Nothing in the treaty nor, indeed, in the exception in section 203, which permits visiting the United States temporarily for business, places a limit as to time or frequency of passing. It is obvious that both intended to observe the freedom of mutual international intercourse for their subjects, in order to engage in business and commerce and to carry on trade. Moreover, the supplemental agreement of 1796 (8 Stat. 130) was made permanent by the nations. Society, etc., v. New Haven, supra; Kent's Commentaries on International Law (Abdys' Ed.) p. 394.

[7] This treaty was intended for the benefit of all British subjects. Shanks ˙v. Dupont, 3 Pet. 241, 7 L. Ed. 666. It is intended to make effective the purposes of the high contracting parties, and should receive a reasonable construction, with a view to giving a fair operation to the whole. Sullivan v. Kidd, 254 U. S. 433, 41 S. Ct. 158, 65 L. Ed. 344; Missouri v. Holland, 252· U. ˙S. 416, 40 S. Ct. 382, 64 L. Ed. 641, 11 A. L. R. 984. The treaty has been considered in force and effect since 1812. Jackson v. Clarke, 3 Wheat. 1, 4 L. Ed. 319 (1818); Hughes v. Edwards, 9 Wheat. 489, 6 L. Ed. 142 (1824); Shanks v. Dupont, 3 Pet. 241, 7 L. Ed. 666 (1830).

[8] Because the relators were not immigrants within section 203, and were within the ex-

ception of that section, they were both permitted to enter the United States temporarily for their respective business, one to work and the other seeking employment. At no time did they intend to remain permanently in the United States, or seek to migrate here. Moreover, the treaty effective at the time of their crossing and recrossing gave them, as British subjects, privileges accorded under the explanatory note of article 3 of the Treaty of 1794, which included that of crossing and recrossing for the purpose of business and commerce, and such they were engaged in. The writs should have been sustained, and their discharge granted.

Order reversed.