**UNITED STATES v. THOMAS et al., and eight other cases.**

Nos. 509, 515, 511, 513, 7, 516, 4, 510.

District Court, N. D. Texas, Lubbock Division.

May 15, 1939.

Clyde O. Eastus, U. S. Dist. Atty., and Wm. P. Walker, Asst. U. S. Dist. Atty., both of Fort Worth, Tex., for the United States.

G. E. Lockhart, of Lubbock, Tex., for defendants.

DAVIDSON, District Judge.

The foregoing cases, raising substantially the same question, were by agreement consolidated and tried together.

The right of the Federal government in a civil action involving a commercial transaction to claim the protection and advantages of sovereign authority, though not allowed to a citizen under the same or similar facts and circumstances, might be stated as the principal issue involved in this controversy.

The defendants in this case are cotton ginners and buyers of cotton from farmers in the Lubbock Division of Texas. The Farm Credit Administration in 1935 made loans to a great number of farmers in this locality, taking a note at $5\frac{1}{2}\%$ interest and a mortgage upon the crop to be produced.

After cotton is grown, it is necessary to harvest, gin, and otherwise process the cotton for market. It is necessary for the farmer to have sufficient funds to pay for this ginning and processing, and in some instances to have financial help to pay for the picking and gathering of the cotton. In this locality the ginners were the principal cotton buyers. When a ginner would complete the ginning and processing, he would frequently buy the cotton from the producer, take out his charges, and pay the balance to the farmer. As a rule the farmer would take the proceeds of his mortgaged cotton to the government agency, the Farm Credit Administration, and pay it upon his mortgage. In some instances they did not do this. In many instances they took out sufficient money to meet the expenses above mentioned. In other instances they retained money for other needs and uses. The agents of the Farm Credit Administration would accept the money when brought in, whether it represented the entire proceeds or only a part.

The defendants assert that the representatives of the Farm Credit Administration gave the farmers permission to retain money out of the proceeds for the above purposes, and in some instances for other purposes. The representatives of the Farm Credit Administration deny the granting of these permits, though it was manifestly necessary in some cases.

Some three years later the Farm Credit Administration, as an agency of the Federal government, instituted suit in the United States District Court at Lubbock, charging conversion of cotton against the above named defendants, and seeking judgment for its value. The defendants contend and answer that the Farm Credit Administration was acting in a commercial sense and that the debts, as such, are barred by limitation; further, that it was necessary to gather, process, and gin the cotton, and that these items do not represent any proper charge for conversion. They specially insist that they bought the cotton in

accordance with the prevailing practice, with the knowledge and consent of the Farm Credit Administrator, who made the loans and who was receiving the collections, and that he permitted the sale and is estopped to maintain any action for conversion.

The government contends that the Farm Credit Administration is a direct agency of the government, instituted to meet an emergency among the farmers of the country, and that limitation would not run against the agency acting for the government in its sovereign capacity, nor has any agent of the government the authority to waive any debt or any lien by which it is or was secured.

It will be conceded that if the plaintiff was suing in the capacity of a private citizen or corporation, as a bank, merchant, or landlord, that the defenses urged would be successfully maintained. The main question, therefore, is: Was the government acting in a private and commercial capacity, or was it acting in its sovereign capacity as in the case of the exercise of police powers for the preservation of the peace at home or for the protection of the nation abroad?

■ Some governments, as a means of raising revenue, have established monopolies in certain commercial fields. In the distant past England took charge of the wool trade and the profits went to the sovereign in lieu of a directly levied tax. In the recent Spanish civil war Franco is said to have financed his armies in a large part by creating a monopoly from the production and sale of olive oil. So far as we know, no such policy has intentionally or deliberately been adopted under the American government. Under our system government means justice and protection; business and commerce mean profits. This idea has prevailed so extensively and so long that only in the last few decades do we find any expression from our higher courts directly upon the subject. One of the early cases is found at Standard Oil Company v. United States, 267 U.S. 76, 45 S.Ct. 211, 212, 69 L.Ed. 519, where it was held: "When the United States went into the insurance business, issued policies in familiar form and provided that in case of disagreement it might be sued, it must be assumed to have accepted the ordinary incidents of suits in such business." In that case the government had, as a result of the World War, in order to keep up shipping, provided a form of marine insurance for the ship and cargo. The ship "Llama" was seized and wrecked off the Orkney Islands. Liability was denied by the government in its capacity as an insurer. Especially was the question of interest controverted, on the ground that interest, unless contracted for, would not run against the government. Mr. Justice Holmes, speaking for the Court, held it a commercial transaction and that interest was a matter of right. Marine governmental insurance was deemed necessary that American commerce be not unduly handicapped, that the American producer and manufacturer should have an opportunity of marketing his products in the ports of the world. It was deemed an emergency requiring governmental action, but Justice Holmes concludes that it was not that same class of governmental action ordinarily covered in the exercise of sovereign powers. We think that the situation in that case was almost analogous to the present case. In the former case there was a need by the American public and shippers for the protection of insurance to the ships that might carry the nation's trade. In the present case there was a need of financial aid or support to the producer that he might not be interrupted or embarrassed in the production of those articles of commerce which would grow upon his farm.

War Risk Insurance for soldiers: Government's counsel, in able and exhaustive briefs, call our attention to White v. United States, 270 U.S. 175, 46 S.Ct. 274, 70 L.Ed. 530; United States v. Worley, Administrator, 281 U.S. 339, 342, 50 S.Ct. 291, 74 L.Ed. 887; Wilbur National Bank v. United States, 2 Cir., 69 F.2d 526, and a long list of authorities bearing upon war risk insurance cases where soldiers engaged in the World War brought suits upon policies and in which a contrary holding was made. The soldier and the policeman stand symbolically, and in fact are the strongest representation of sovereignty in the exercise of its police powers. It is not believed that the providing of insurance for the soldier in line was entirely of the same class as a governmental act of providing for the insurance of shipping and for financial aid in agricultural activities. The one represents the exemplification of sovereignty that stands for peace at home and protection abroad; the other represents the convenience and well-being of the business and private side of the nation's

commercial activities. The government wants its soldiers equipped and trained to fight; it wants his ammunition dry and his morale good and high. In order to maintain this morale it did not feel that it should stand by and see the soldier downcast and his spirits dampened when told that his insurance, that he had carried for the protection of his loved ones at home, was now cancelled and annulled because he had entered war. To offset this, government insurance in policies of $10,000 and less was provided for these soldiers.

Moreover, when the war risk insurance policy was issued, we were as a nation at war. When the financial aid given the farmers in this case was contracted, we were at peace. The farmer didn't go hungry, he just couldn't sell what he had produced. There was a congestion. The farmer was financially embarrassed. His clothes were in rags. The luxuries of life were no longer his. He remembered well the prosperity of 1918 and 1926, now gone. Likewise he remembered the panic of 1893 when he sold his cotton for four cents a pound. He also remembered that Adam Smith, the great economist, had taught him more than a century ago that the agrarian brother was a stepchild in the legislative halls. Yet he hoped on and on, with sublime faith in the ultimate justice of his country. He took not up his musket against his nation, nor did he ravage the corn crib of his neighbor. He saw the action of the government in extending this financial aid as a big-hearted effort of a great nation to relieve his then financial ills. This may be aside from the record to a degree, but Mr. Justice Cardozo, in the telephone case, Ohio Bell Telephone Co. v. Public Utilities Comm., 301 U.S. 292, 57 S.Ct. 724, 729, 81 L.Ed. 1093, gave voice to this very rational and humanlike expression: "Courts take judicial notice of matters of common knowledge. * * * 'The precedents of former judges, in declining to notice or assenting to notice, specific facts, do not restrict the present judge from noticing a new fact, provided only that the new fact is notorious to the community.'" The author of this opinion was reared upon a farm and has not through the years lost his contact, though his connection be now an expensive holding.

Aside from controversial moralizing, let us look again for precedents and for rulings upon this subject by our higher courts in another field, but which, by analogy, bears directly upon the point in issue, and in which there is an abundance of authority. This field is the dual power in which our cities and towns are operated. They hold in one hand the police power delegated from the states: they hold in the other commercial and business activities exercised for the benefit of the municipality. Looking backward to the beginning, the state is older in fact and theory than the nation. Article 10 of the Bill of Rights reads: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Thus, through the instrumentality of the Constitution, the state has delegated certain police powers and certain other powers to national sovereignty. The state, by legislation and by special charter, has delegated to the city in its municipal government certain police power and certain other authority. Let us now look to see how our courts of last resort, and how our cities, under the guidance of these courts, have exercised this right of sovereignty delegated to them from the states:

In the case of Vilas v. Manila, 220 U.S. 345, 356, 31 S.Ct. 416, 418, 55 L.Ed. 491, Mr. Justice Lurton states: "They [municipal corporations] exercise powers which are governmental and powers which are of a private or business character. In the one character a municipal corporation is a governmental subdivision, and for that purpose exercises by delegation a part of the sovereignty of the state. In the other character it is a mere legal entity or juristic person. In the latter character it stands for the community in the administration of local affairs wholly beyond the sphere of the public purposes for which its governmental powers are conferred."

A private corporation or person may supply a city with its utilities, with light and water, but it has never yet exercised sovereign power and administered the government. The state has delegated sovereign authority to the city; it has likewise authorized the city to carry on certain commercial and business activities, but, as Justice Lurton has well observed, these affairs are "wholly beyond the sphere of the public purposes for which its governmental powers are conferred." This is the uncontroverted law, as we understand it, of the distant past and of the immediate pres-

436

ent. See also 43 C.J. 200; 43 C.J. 920, 921, 922, 924; United States v. Kirkpatrick, 9 Wheat. 720, 735, 6 L.Ed. 199; Gibbons v. United States, 8 Wall. 269, 19 L.Ed. 453. The two latter cases refer back directly to losses sustained by governmental agencies.

It is not believed that conversion in any event would lie for the necessary expense of processing and ginning this cotton, nor should judgment run in those instances where the government at the time of the institution of this suit held assignments from the farmer to other funds sufficient to liquidate the debt for which the ginner or buyer is sought to be held for conversion.

It is the opinion of this court that the law bearing upon marine insurance as stated by Justice Holmes, Standard Oil Co. v. United States, 267 U.S. 76, 45 S.Ct. 211, 69 L.Ed. 519, controls in this case. It is further the opinion of the court that the law stated by Justice Lurton in the Manila case is applicable here. Not only is it stated in the Manila case, but it has remained the universal doctrine that wherever the city has operated in a commercial sense, the rights of sovereignty did not apply, and where it acted in its sovereign capacity, then they would apply.

There is another reason that appeals powerfully to the Court in reaching the conclusion it has—the doctrine so often announced by the late Judge Fly of Texas to the effect that municipal corporations and governmental agencies are honor bound to deal in commercial transactions with that same degree of fairness and honor that the government expects of its citizens. City of Mission v. Eureka Hose Mfg. Co., Tex.Civ.App., 67 S.W.2d 455. It must be borne in mind that the men and parties sought to be held in this case could not be held if the controversy were between private concerns or individuals and not with the government of the United States. Caesar entered the Olympian games; the other contestants dared not win and still they dared not quit. They had to run— they had to lose. The policeman must not use his "billy" in his private quarrel. In commercial transactions the government should require of no citizen adherence to a rule between men which it is unwilling to follow. When authority steps down upon the plane of business and commerce, it should leave its scepter back upon the throne from whence it came.