**AMAYA et al. v. STANOLIND OIL & GAS CO. et al.**
**Civil Action No. 236.**

District Court, S. D. Texas,
Corpus Christi Division.

Aug. 4, 1945.

D. B. Chapin, of Mission, Tex., E. Garland Brown, of Corpus Christi, Tex., and R. Tuck Chapin, of San Antonio, Tex., for plaintiffs.

Frank J. Scurlock and Turner, Rodgers & Winn, all of Dallas, Tex., Kemp, Lewright, Dyer, Wilson & Sorrell, of Corpus Christi, Tex., Paul A. McDermott, of Fort Worth, Tex., and B. D. Tarlton, of Corpus Christi, Tex., for defendants.

HANNAY, District Judge.

This law suit is brought by the plaintiffs, who allege that they are resident citizens of the Republic of Mexico, to recover title to property located in the south half of Section 44 of the Paul Subdivision of the Robert Driscoll Ranch, in Nueces County, Texas. The land in question lies between the Nueces River and the Rio Grande and was, until at least 1836, in the Mexican department, or state, of Tamaulipas. For cause of action plaintiffs rely on land grants issued by the Spanish Government in 1806, through which they claim as heirs of one Pedro Ygnacio Garcia, who, they assert, became the owner of said lands in 1811. The basis of plaintiffs' assertion of title is under Article VIII of the Treaty of Guadalupe Hidalgo, 9 Stat. 929, which was signed at the place from whence it gets its name, located about four miles from the City of Mexico. Article VIII of said Treaty of Guadalupe Hidalgo reads as follows:

"In said territories, property of every kind, now belonging to Mexicans, not established there, shall be *inviolably respected*. The present owners, the heirs of those and all Mexicans who may hereafter acquire said property by contract, shall enjoy with respect to it, guarantees *equally ample*, as if same belonged to citizens of the United States."

This Treaty was proclaimed on July 4, 1848.

(The italics in the above extract, as well as elsewhere in this opinion, whether in a quotation or not, is made by this Court in the interest of clarity and emphasis.)

Plaintiffs strongly press upon the court their contention that "in said territories, property of every kind, now belonging to Mexicans, not established there, shall be inviolably respected," means that the land here in dispute is still subject to the laws of Mexico and is not now and never has been subject to the laws of Texas.

It is further plaintiffs' contention that the Constitution of the United States is superior to any laws of Texas because Texas be-

came subject to it when she became one of the United States. The Constitution provides:

Art. VI, Cl. 2, Supreme Law. "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

And, therefore, that no rule of prescription, limitation or laches operates against them.

Plaintiffs seek judgment for title and possession of the land and premises above mentioned, for general relief, and in addition thereto, have filed a motion for summary judgment against the defendants herein, which motion they have supplemented by documentary evidence.

The defendants have answered and, generally speaking, urge the following defenses:

1. That the land in question is not "within territory previously belonging to Mexico" or "ceded territory" as contemplated by the Treaty of Guadalupe Hidalgo.

2. That, assuming the treaty does apply, then, based on the second sentence in the above quoted part of Article VIII, there should not be any discrimination in favor of Mexican citizens as against citizens of Texas or citizens of the United States, and that this suit is without merit.

(Whenever the word "treaty" is used in this opinion, the Guadalupe Hidalgo Treaty is referred to.)

3. That the land in question is subject to the laws of Texas, particularly with reference to the statutes of limitations of three, five, ten and twenty-five years, and Texas land laws applicable to abandonment of title and presumptions of grant, under which laws defendants assert they have full and perfect title.

Defendants have asked for general relief, that their title be quieted in them, and in addition thereto, have made a motion for summary judgment, which motion is supported by affidavits on file herein.

Inasmuch as this is one of a number of similar lawsuits filed by attorneys representing these plaintiffs, on behalf of other alleged resident citizens of Mexico, and because the effect of the decision herein is so important to the owners of the land lying between the Rio Grande and the Nueces River, which area is so vast and valuable, it is deemed well to discuss briefly the historical facts relating to this law suit.

On March 2, 1836, the Texas Declaration of Independence was declared at Washington on the Brazos, by 59 delegates. Previously thereto, and at that time, Texas and Coahuila were joined in a single state, or department. The only references to the State of Coahuila are as follows:

"It has sacrificed our welfare to the State of Coahuila, by which our interests have been continually depressed through a jealous and partial course of legislation carried on at a far distant seat of government, by a hostile majority, in an unknown tongue," and "It has dissolved by force of arms, the State Congress of Coahuila and Texas, and obliged our representatives to fly for their lives from the seat of government; thus depriving us of the fundamental political right of representation."

The last paragraph reads as follows:

"We, therefore, the delegates, with plenary powers, of the people of Texas, in solemn convention assembled, appealing to a candid world for the necessities of our condition, do hereby resolve and declare that our political connection with the Mexican nation has forever ended; and that the people of Texas do now constitute a free, sovereign and independent republic, and are fully invested with all the rights and attributes which properly belong to independent nations; and, conscious of the rectitude of our intentions, we fearlessly and confidently commit the issue of the decision to the Supreme Arbiter of the destinies of nations."

It is thus seen that this declaration was made by the people of Texas and, except as above mentioned, that neither Coahuila nor Tamaulipas, called Nuevo Santander, were not mentioned as being departments, or states, included in the Declaration of Texas. The name "Texas" was adopted by the delegates, mostly Anglo-Americans, included among whom was Sam Houston, who signed the declaration on the anniversary of his birthday, to-wit: March 2, 1836.

On April 21, 1836, the Battle of San Jacinto was won by the Texas army under General Sam Houston. This battle, known as the sixteenth decisive battle in the history of the world, resulted in the almost total annihilation of the Mexican army and in the capture of the Mexican President,

Santa Anna, and some 800 of his soldiers. At the time of the capture of Santa Anna, the following conversation, which is significant when considered in connection with the Treaty of Velasco and the Secret Agreement, of even date, took place:

"After embracing Almonte and recovering entirely from his embarrassment, Santa Anna, with the air of one born to command, rose and said to General Houston:

"That man may consider himself born to no common destiny who has captured the Napoleon of the West; and it now remains for him to be generous to the vanquished.

"Houston: You should have remembered that at the Alamo.

"Santa Anna: You must be aware that I was justified in my course by the usages of war. I had summoned a surrender, and they had refused; the place was then taken by storm, and the usages of war justified the slaughter of the vanquished.

"Houston: That was the case once, but it is now obsolete. Such usages among civilized nations have yielded to the influence of humanity.

"Santa Anna: However, this may be, I was acting under the orders of my government.

"Houston: Why, *you are the government of Mexico.*

"Santa Anna: I have orders in my possession commanding me to so act.

"Houston: *A dictator, sir, has no superior.*"

Shortly thereafter, on May 14, 1836, the Treaty of Velasco was entered into by Santa Anna, in his character as President of the Mexican Republic and clothed with the supreme power, and President David G. Burnet, of Texas, and his cabinet, by which the independence of Texas was acknowledged. This treaty reads, in part, as follows:

"Articles of Agreement entered into between his Excellency David G. Burnet, President of the Republic of Texas, of the one part, and his Excellency, General Lopez de Santa Anna, President-General-in-Chief of the Mexican Army, of the other part, * * *

"Art. 3. The Mexican troops will evacuate the territory of Texas, passing to the *other side* of the Rio Grande del Norte."

At the same time a secret agreement was made with Santa Anna, Article 4 of which reads:

"Art. 4. A treaty of commerce, amity and limits will be established between Mexico and Texas, the territory of the latter *not to extend beyond the Rio Bravo del Norte.*"

"Rio Grande del Norte" or "Rio Bravo del Norte" as used in the Treaty of Velasco and the secret agreement, and elsewhere in this opinion, mean, of course, the Rio Grande.

After the execution of this treaty and the secret agreement, and as a reward for his signing same, on the same day (although there was a great popular demand in Texas for the return of Santa Anna to the scene of the Goliad massacre, there to be executed), Santa Anna was permitted to leave Texas and return to Mexico. The Treaty of Velasco was likewise approved by other Mexican general officers and by its Secretary of War, although it was not ratified, but expressly rejected, by the Mexican Congress. A copy of these agreements were forwarded to the Mexican General, Filisola, then at the head of about 5,000 Mexican troops, and he was permitted by the Texas Republic to retire beyond the Rio Grande without molestation, to thus save his army from destruction. It is argued that Santa Anna, having signed the above mentioned treaties while he was a prisoner of war, was thus under duress and, therefore, the treaty was not binding on his government. However, the conversation with General Houston, above quoted, immediately after his (Santa Annas') capture, throws strong light on his power and authority to so represent Mexico. Life and Select Literary Remains of Sam Houston of Texas, Crane, 101.

This, however, was not the first assertion by citizens of Texas that the Rio Grande was the boundary between Texas and Mexico. The first record of any such claim is contained in a report of Edward Burleson, Commander in Chief of the Volunteer Army of Texas, to Henry Smith, Provisional Governor of Texas, from Bexar, in December, 1835, wherein General Cos, a Mexican officer, after the battle near the Alamo, in which battle Ben R. Milam lost his life, agreed in writing to retire with his officers and men beyond the Rio Grande. Such agreement was signed on December 11, 1835, by General Martin P. de Cos on behalf of Mexico and Edward Burleson, Commander in Chief of the Volunteer Army of Texas. Readings from Texas History, Barker.

On December 19, 1836, the first Congress of Texas passed a law which reads as follows:

"To define the boundaries of the Republic of Texas.

"Sec. 1. Be it enacted by the senate and house of representatives of the Republic of Texas, in Congress assembled, That from and after the passage of this act, the civil and political jurisdiction of this republic be, and is hereby declared to extend to the following boundaries, to-wit:

"Beginning at the mouth of the Sabine River, and running west along the Gulf of Mexico three leagues from land, to the mouth of the Rio Grande, then up the principal stream of said river to its source, thence due north to the forty-second degree of north latitude, thence along the boundary line as defined in the treaty between the United States and Spain, to the beginning; and that the president be, and is hereby authorized and required to open negotiations with the government of the United States of America, as soon as in his opinion the public interest requires it, to ascertain and define the boundary line as agreed upon in said treaty."

This identical description is upon the attached map marked Exhibit A:

wit: December 29, 1845, a new constitution was adopted which expressly provided for the continuation of such prior enactment in full force.

Almost immediately thereafter, on December 31, 1845, only two days after Texas was admitted as a state, the Congress of the United States passed a law establishing a collection district in the State of Texas. Corpus Christi, west of the Nueces, was made a port of delivery, for which a surveyor was afterwards appointed.

It is thus contended that the territories claimed by Texas, particularly as between the Republic of Mexico and the Republic of Texas, were approved and adopted by the United States at the time that Texas became a state. This matter will be further discussed in this opinion.

From after the battle of San Jacinto, in 1836, until the Treaty of Guadalupe Hidalgo, customs houses, post offices and post roads, as well as election precincts, were established around the town of Corpus Christi. The County of San Patricio was laid out, which reached to the Rio Grande. Members of the Texas Congress were elected who resided on the right bank of the Nueces, and that part of Texas was represented in the Congress and in the

This act of Texas has never been repealed, and at the time that Texas was finally admitted to the United States, to-

Convention by which the resolution of annexation to the United States was accepted. Texas sent out boats to watch the

coast and reconnoiter the Laguna Madre and the Brazos. In the fall of 1838, when their ports were blockaded by the French Fleet, the Mexicans secretly landed a cargo of flour at a place about ten miles west of the present town of Corpus Christi, for the purpose of conveying it across the country to Mexico. The vessel was seized and the flour destroyed under orders of the Collector of the District, for violating the revenue laws of Texas. It is from this incident that "Flour Bluffs," now the site of a great United States naval base, received its name.

The Republic of the Rio Grande was proclaimed, which had for its purpose the forming of a separate republic between the Nueces River and the Rio Grande, having for its capitol, Laredo. This venture ended disastrously in the year 1842.

In 1837 the United States recognized Texas as a separate republic. In this connection, Texas furnished the United States with a description of the boundaries of Texas, taken almost literally from the Texas Act of December 19, 1836. Shortly thereafter, France, Holland and Belgium likewise recognized Texas as a republic.

During the administration of the first President of the Texas Republic, Sam Houston, an attempt was made to secure the admission of Texas as a state in the Union. This attempt was unsuccessful, but another attempt was made in 1844, and negotiations continued until the final consummation, as hereinafter described more in detail. During all of this time the claim of Mexico was to the entire length and breadth of Texas, and not to any lesser portion thereof. During the negotiations of 1844, and in compliance with the call of the Senate, pending the attempt to secure the admission of Texas into the Union, President Tyler sent to the United States Senate a map of the country proposed to be secured as Texas, and upon that map is shown "Texas and the Countries Adjacent. Compiled in the Bureau of the Corps of Topographical Engineers. From the Best Authorities. For the State Department. Under the Direction of Colonel J. J. Abert, Chief of the Corps, by W. H. Emory, 1st Lieut. T. E. War Department, 1844." A photostatic copy of this map is hereto attached, marked Exhibit A, and made a part hereof. It accepts as correct the boundaries as defined by an Act of the Texas Congress, approved December 19, 1836, a copy of which Act has been heretofore set out. This map shows the Rio Grande as the boundary line between the Republic of Mexico and the Republic of Texas. It was on this map that the negotiations were had which resulted in the annexation of Texas. See also the certificate accompanying such map, which is marked Exhibit B, and made a part hereof.[1]

[1] Exhibit "B"

The National Archives
Washington, D. C.
October 2, 1944

Honorable Allen B. Hannay
  United States District Judge
  Houston 2, Texas

Dear Judge Hannay:

In response to your letter of September 19, 1944, to the Honorable Albert Thomas, which was forwarded by him to the National Archives on September 28, we are sending you a photostat of a copy of the "Map of Texas and the Countries Adjacent: Compiled in the Bureau of the Corps of Topographical Engineers, From the Best Authorities. For the State Department. Under the direction of Colonel J. J. Abert, Chief of the Corps, by W. H. Emory, 1st Lieut. T. E. War Department, 1844." It is this map of Texas and accompanying memoir to which reference is made in President Tyler's message to the Senate dated April 26, 1844, which message and memoir are printed in 28th Congress, 1st Session, Senate Document 341, pp. 55-63.

The following is submitted for your information for whatever bearing it may have on your writing of the case in question:

The photostat being sent you is made from a printed copy of the map. Whether the map transmitted by President Tyler to the Senate on April 26, 1844, was the manuscript original is not known. So far the manuscript original has not been found in the National Archives. From the technical knowledge available in our Division of Maps and Charts it is believed, however, that this would have no essential bearing on the content of the map. To judge from similar contemporary cases in which both original map and printed reproductions of the same map are in the National Archives, and in view of the fact that the engraving of the map was done under the supervision of the Topographical Engineers of the War Department, men of high technical standards, it is believed that the printed map is a satisfactory and accurate rendering of the original drawing.

In one important respect the printed map is manuscript in character—the

After the election of President James K. Polk, but before he had taken office, the Congress of the United States passed, and President Tyler approved, on the 1st day of March, 1845, a resolution which set forth the basis upon which Texas might be admitted as one of the states of the Union, which reads in part as follows:

"Joint Resolution for annexing Texas to the United States.

"Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That Congress doth consent that the *territory properly included within,* and *rightfully belonging to the Republic of Texas,* may be erected into a new State, to be called the State of Texas, with a republican form of government, to be adopted by the people of said republic, by deputies in convention assembled, with the consent of the existing government, in order that the same may be admitted as one of the States of this Union." 5 Stat. 797.

The second paragraph of such resolution, among other things, provides for the settlement of all questions of boundary that may arise with other governments, and for the retention by Texas of all vacant and unappropriated lands lying within its limits. This was a simple resolution, not a treaty, and it passed the United States Senate by a vote of 27 to 25, largely through the efforts of James Buchanan. It passed the House of Representatives by a much larger vote.

---

boundaries of Texas are shown by means of a narrow band added by hand in water color to the printed map. This follows the practice of the time, in the days before extensive color printing by lithography, according to which color was added by hand on engravings and the like, especially since the number customarily printed of such engravings in those days was small.

This narrow band of water color attempts only to follow in general, or to "pick out", the rivers, parallels of latitude, and meridians of longitude that constitute the boundary (as you may discern on the photostat), and too much importance should, therefore, not be attached to slight deviations of the color band from the actual features constituting segments of the boundary. In other words, however much the color band may waver, the author intended to show the boundary as defined by the Rio Grande, the 42nd parallel, the meridian of the source of the Arkansas River, the Arkansas itself, the 100th meridian, the Red River, the lower Sabine River, etc.

The color of the boundary band on the copy of the printed map that has been photostated is light brown. Previous experience in our Division indicates it might 100 years ago well have been red and have changed in the interval. This is mentioned in connection with your reference to the "boundaries claimed by Texas [being] marked in red lines" on the map.

The printed copy of the map of which a photostat is being sent was transferred to the National Archives from the records of the United States Senate, as indicated on the bottom margin of the photostat. Other identical printed copies were transferred from the records of the Office of the Chief of Engineers, War Department.

The photostat being sent you is smaller in size than the printed map. The map was reduced in photostating so that it would go on one sheet of photostat paper and thus be easier to consult. The frame of the printed map is 21 x 32¾ inches, and the linear scale in the lower right corner is exactly 70 miles to 1 inch. On the photostat the scale is about 105 miles to 1 inch. This ratio represents the reduction. In the photostat the upper Nueces River is rather faint; on the printed map the river is shown to rise in the small lake 180 miles due west of Austin.

From your letter we are not sure whether you are under the impression that the map constitutes Senate Document No. 341. This is not the case. Senate Document No. 341, 28th Congress, 1st Session, consists of the printed text of messages and reports totaling 119 pages and entitled, in the copy of the relevant volume in the National Archives library, "Proceedings of the Senate and Documents Relative to Texas, From Which the Injunction of Secrecy Has Been Removed." The document is in Vol. 5 of the 7-volume set entitled "Public Documents Printed by Order of the Senate of the United States, First Session of the Twenty-Eighth Congress." Vol. 5 is No. 435 in the Congressional series. These details are given in case you wish to consult the text in a local library. If there are no copies in Houston I am advised by our Library that there may be copies at the University of Texas or in the law library of Southern Methodist University, Dallas.

Sincerely yours,

W. L. G. Joerg
Chief, Division of
Maps and Charts

188

It is interesting to here note that the annexation agreement had this to say with reference to questions of boundary: "* * * all questions of boundaries that may arise with other governments * * * shall be transmitted to the President of the United States, to be laid before Congress for its final action, on or before the first day of January, one thousand eight hundred and forty-six."

The map attached hereto as Exhibit A was included in Senate Document No. 341, 1st Session, 28th Congress.

Another matter worthy of note with reference to this joint resolution was that the only ceding done by Texas to the United States was in the second paragraph, which reads, in part, as follows:

"* * * After ceding to the United States, all public edifices, fortifications, barracks, ports and harbors, navy and navy-yards, docks, magazines, arms, armaments, and all other property and means pertaining to the public defence belonging to said Republic of Texas * * *."

The balance of such property rightfully belonging to the Republic of Texas was reserved by the new state. Also, as a part of the obligation of the United States, pending approval or rejection, as the case may have been, of the annexation agreement, the United States was obligated to defend with its armies the boundaries claimed by Texas.

At the time of such negotiations with Texas, Anson Jones was the President of the Republic of Texas, and he transmitted to the convention called by him the joint resolution for annexing Texas, which had been approved by the United States, as above mentioned, on the 1st day of March, 1845. This resolution was approved by the Convention of Texas on July 4, 1845, and as a part of the Texas Convention, a constitution was framed and adopted. It contained a description of Texas' boundaries, which made the boundary between Mexico and Texas the Rio Grande. Congress approved the constitution containing such declaration of boundary on December 29, 1845, and soon thereafter, to-wit: on February 19, 1846, President Anson Jones relinquished the executive office to Governor J. Pinckney Henderson, with the statement: "The Republic of Texas is no more."

Here it is well to consider the attitude of the American statesmen concerning the annexation of Texas. The Whig Party was opposed to the annexation because, as they alleged, it would be an act of bad faith toward Mexico; because the debt of Texas, said to be more than 10 million dollars, was to be assumed by the United States; and because they were opposed to the extension or increase of slave territory. The Democratic Party, generally, favored annexation. Mr. Van Buren and Mr. Clay very nearly agreed in these opinions. Both expressed themselves favorably to the acquisition of Texas at some future time if the American people desired it; provided, however, the consent of Mexico could be obtained, or, at least, that efforts be made to procure it. James K. Polk of Tennessee came out strongly for the immediate annexation of Texas, received the nomination of the Democratic Party for the Presidency, and was elected over his Whig opponent, Mr. Clay. The issue in that campaign was clear: "Polk and Texas"—"Clay and no Texas."

President Polk said in his inaugural address:

"The republic of Texas has made known her desire to come into our Union, to form a part of our confederacy, and to enjoy with us the blessing of liberty secured and guaranteed by our constitution. Texas was once a part of our country—was unwisely ceded away to a foreign power—is now independent, and possesses an undoubted right to dispose of a part or the whole of her territory, and to merge her sovereignty as a separate and independent State, in ours. I congratulate my country that, by an act of the last Congress of the United States, the assent of this government has been given to the reunion; and it only remains for the two countries to agree upon the terms, to consummate an object so important to both.

"I regard the question of annexation as belonging exclusively to the United States and Texas. They are independent powers, competent to contract; and foreign nations have no right to interfere with them, or to take exceptions to their reunion."

By the statement "Texas was once a part of our own country," President Polk alluded to the claim made by every United States President from Jefferson down to himself, that Texas was a part of the Louisiana Purchase of 1803. This claim, however, was relinquished by the United States in the Florida Treaty with Spain in 1819. However, it is interesting to note in this connection that two members of Congress, one a future president of the United States, to-wit:

Abraham Lincoln, and another, a former president of the United States, John Quincy Adams, both then members of Congress, were strongly opposed to the annexation of Texas, giving as their reasons the fact that they believed it would cause war with Mexico, to which they were strongly opposed. It is also interesting to note that two well known American statesmen, Henry Clay and Daniel Webster, each resigned as Secretary of State shortly before the annexation of Texas, each giving as his reason therefor the fact that he believed the annexation of Texas would lead to an unjust war with Mexico. However, when the war did come, each of these gentlemen had a son, namely, Henry Clay, Jr., and Edward Webster, who fought for their country and died in Mexico.

Upon the passage of the Joint Resolution on March 1, 1845, above referred to, the Mexican Minister at Washington, General Juan Almonte, under date of March 6, 1845, protested in the name of his government, and requested his passports. In his letter to John C. Calhoun, Secretary of State of the United States of America, he said, among other things, that "Mexico intended to recover the Province of Texas, of which she now holds herself unjustly despoiled, and that she will maintain and uphold those rights at all times by every means which she has in her power."

In his first annual message to Congress, delivered on December 1, 1845, President Polk communicated to the two houses of Congress, as follows:

"The moment the terms of annexation, offered by the United States, were accepted by Texas, the latter became so far a part of *our own country*, as to make it our duty to afford such protection and defense. I therefore deemed it proper, as a precautionary measure, to order a strong squadron to the coast of Mexico, and to concentrate an efficient military force on the *western frontier of Texas*. Our army was ordered to take position in the country *between the Nueces and the Del Norte, and to repel any invasion of the Texan territory which might be attempted by the Mexican forces. * * "*

From the above it is clearly apparent that the President of the United States was strongly of the opinion that the Rio Grande constituted the boundary line between Texas and Mexico at the time of the agreement of annexation.

President Anson Jones, who had served as Secretary of State just previous to be-

ing elected president of the Texas Republic, also had no doubt as to what constituted such boundary. He wrote, shortly after the annexation, as follows:

"There was no subject more explicitly agreed upon, understood and settled between Major Donelson and myself, in 1845, than that the Rio Grande, from its mouth to its source, was the true and rightful boundary of Texas (as defined in the Act of 1836), and that the United States would never agree to any other adjustment of the boundary with Mexico than the one defined by said act. On the part of the United States that boundary was fully recognized; no other one was ever dreamed of." History of Texas, L. W. Newton and H. P. Gambrell, page 244.

Then, too, the first United States Senators from Texas, to-wit, Sam Houston and Thomas J. Rusk, both former generals in the army of the Republic of Texas, had similar opinions. Rusk wrote "Texas has made her mark," and asserted that her claim was to the whole territory lying on the left bank of the Rio Grande or Rio Bravo del Norte. Houston, at the time of the consideration of the declaration of war between the United States and Mexico, made a short documented speech in the United States Senate in which he apparently convinced those who had formerly opposed Texas' annexation, of the righteousness of Texas' claim to the Rio Grande as its correct boundary. As before stated, the claim of Mexico at that time was not to any lesser portion of Texas, but to the entire area formerly a part of Mexico. The Mexican Government was not claiming merely the area between the Rio Grande and Nueces River, but all of Texas. It was not a question of boundary to a portion of Texas, but title to the entire state.

With reference to the status of the situation between Texas and Mexico after the Battle of San Jacinto, and until December, 1843, the following extract from the message of President Tyler to the Congress of the United States is particularly apt:

"The war which has existed for so long a time between Mexico and Texas has since the battle of San Jacinto consisted for the most part of predatory incursions, which, while they have been attended with much suffering to individuals and have kept the borders of the two countries in a state of constant alarm, have failed to ap-

proach any definite result. Mexico has fitted out no formidable armament by land or sea for the subjugation of Texas. Eight years have now elapsed since Texas declared her independence of Mexico, and during that time she has been recognized as a sovereign power by several of the principal civilized states. Mexico, nevertheless, perseveres in her plans of reconquest, and refuses to recognize her independence. The predatory incursions to which I have alluded have been attended in one instance with the breaking up of courts of justice, by the seizing upon the persons of the judges, jury, and officers of the court and dragging them along with unarmed, and therefore non-combatant, citizens into a cruel and oppressive bondage, thus leaving crime to go unpunished and immorality to pass unreproved."

Some of these predatory incursions referred to in President Tyler's message had gone far east of the Nueces River.

When, after the annexation, General Zachary Taylor moved with military forces, he promptly went to, but not south of, the Rio Grande. No protest was made by the Mexican Government when the United States army crossed the Nueces River. It was only after the Mexican army had crossed north of the Rio Grande to engage the army of General Taylor in combat, and after the Mexican President had declared war upon the United States, that the United States recognized that a state of war existed, and General Taylor moved south of the Rio Grande. General Taylor began to move his army from Corpus Christi to the Rio Grande on March 8, 1846, under orders of the United States War Department. He arrived opposite Matamoros on March 28, 1846, and there entrenched. A demand was then made by the Mexican General that he (Taylor) remove his army. This demand was rejected. President Paretes of Mexico, on April 23, 1846, directed that a "defensive war" against the United States be begun. The Mexican General, Arista, moved across the Rio Grande, was defeated on May 8th at Palo Alto, on the next day at Resaca de la Palma, and on May 18, 1846, Taylor took possession of Matamoros, on the south side of the Rio Grande. On May 13, 1846, President Polk signed a resolution of the American Congress declaring a state of war to exist between the United States and Mexico. Wortham, Vol. 4, pages 213, 214.

Or stated in other and clearer language, as set forth in Wooten's History of Texas, Vol. 1, page 688:

"President Polk, in his second annual message to Congress, December 8, 1846, in an unusually able summary of the causes which led to the war with Mexico, among other things, says: 'The annexation of Texas to the United States constituted no just cause of offense to Mexico,' and sustains his position by an unanswerable array of historical facts.

"Referring to the assertion which the opponents of Texas Independence and of annexation made, that the claim of Texas to the Rio Grande instead of the Nueces, as her western boundary, was the cause of the war, he says that as early as December 19, 1836, the Republic of Texas passed an Act defining the boundaries of Texas and laid down the Rio Grande to be her western boundary from its mouth to its source, and that during all the period between the adoption of the Constitution of the Republic, March 17, 1836, to annexation, December 29, 1845, she claimed and exercised exclusive sovereignty and jurisdiction over the country between the Nueces and Rio Grande; organized and defined limits of counties extending to the Rio Grande; established custom houses and collected duties and established post offices between the rivers; established a land district in the same limits; courts of justice, and, in short, exercised full sovereignty over the country between the Nueces and the Rio Grande, from the adoption of the Constitution down to annexation, the same as over other parts of Texas.

"President Polk further says in the same message: 'But Mexico herself has never placed the war which she has waged upon the ground that our army occupied the intermediate territory between the Nueces and the Rio Grande. * * * Her avowed purpose in commencing the war was to reconquer Texas and to restore Mexican authority over the whole territory —not to the Nueces but to the Sabine."

This Court recognizes that then, as now, there were and are many people who contend that the entry of the United States into this war was unjust. Inasmuch as the Constitution of the United States, Art. I, Section VIII, under Legislative Department, provides: "The Congress shall have Power * * * To declare War, * * *" this power is exclusively given to that branch of the Federal Government, and

neither the Executive nor Judiciary Department has any right to challenge or revise such legislative action. It therefore follows that such legislative action was conclusive on that point.

This war continued for some 18 months, during which times Generals Winfield Scott and Zachary Taylor were universally victorious. They captured a great portion of Mexico, including the Palacio of Mexico.

On February 2, 1848, at Guadalupe Hidalgo, a treaty with Mexican Commissioners was concluded by Mr. Trist, representing the United States.

Shortly after annexation, the first legislature of the new State of Texas again made quite definite what area Texas was claiming, and quoted below is a portion of the Joint Resolution, dated April 29, 1846:

"Declaring the exclusive right of the State of Texas to the jurisdiction over the soil included within the limits thereof:

"Section No. 1. Be it resolved by the Legislature of the State of Texas, That the exclusive right to the jurisdiction over the soil included in the limits of the late Republic of Texas was acquired by the valor of the people thereof; and was by them vested in the government of the said Republic, that such exclusive right is now invested in and belongs to the State, excepting such jurisdiction as is vested in the United States, by the constitution of the United States, and by the joint resolution of annexation, subject to such regulations and control as the government thereof may deem expedient to adopt. * * *"

This joint resolution was, of course, passed before the Treaty of Guadalupe Hidalgo was entered into. In fact, everything which has been discussed up to this point took place before the Treaty of Guadalupe Hidalgo, and to say that any part of the present State of Texas was regarded as "territory previously belonging to Mexico" does not conform to the true facts.

It has been definitely stated by the Supreme Court of the United States on at least two occasions that the Treaty of Guadalupe Hidalgo does not have reference and does not apply to any land located within the State of Texas.

In McKinney v. Saviego, 18 How. 235, 240, 15 L.Ed. 365, it is stated:

"The last question remaining for consideration arises on the 8th section of the treaty with the republic of Mexico on the 2d February, 1848, (9 Stats. at Large, 923) called the treaty of Guadalupe Hidalgo. The first clause of that article provides 'for the Mexicans now established in territories previously belonging to Mexico, and which remain for the future within the limits of the United States.' The second clause provides for those who shall prefer to remain in the said territories, and they are authorized to retain the title of Mexican citizens or acquire the rights of citizens of the United States. The third clause prescribes, 'that in the said territories property of every kind, now belonging to Mexicans not established there, shall be inviolably respected. The present owners, the heirs of these, and all Mexicans who may hereafter acquire said property by contract, shall enjoy with respect to it guarantees equally ample as if the same belonged to citizens of the United States.' To what territories did the high contracting parties refer to in this article? *We think it clear that they did not refer to any portion of the acknowledged limits of Texas. * * *"*

In the case of Elisha Basse v. City of Brownsville, 154 U.S. 610, 14 S.Ct. 1195, 22 L.Ed. 420, it is stated:

"This writ of error is dismissed for the want of jurisdiction. In McKinney v. Saviego, 18 How. [235], 240 [15 L.Ed. 365], *it was decided that the treaty of Guadaloupe Hidalgo had no relation to property included within the state of Texas. * * *"*

Chief Justice Waite delivered the opinion of the court.

By authority of the above cases it is shown that the Treaty of Guadalupe Hidalgo does not apply to Texas, and that therefore the Texas law should be applied in considering the rights of the litigants herein. The attitude of Texas towards titles to land between the Nueces and Rio Grande, which had their origin in grants from either Spain or Mexico, whether north or south of the Nueces, is impressively shown in the opinion so ably written by Judge Nelson Phillips in the case of Kenedy Pasture Co. v. State, 111 Tex. 200, 231 S.W. 683, 689, writ of certiorari denied May 18, 1921, 258 U.S. 617, 42 S. Ct. 271, 66 L.Ed. 793, from which we quote:

"The land in controversy lies in what was at one time the Mexican State of

Tamaulipas, between the Nueces and the Rio Grande rivers. This is the foundation of the claim, very earnestly pressed by Kenedy and others holding under Villareal, that the Governor of Tamaulipas had authority to issue Villareal a grant on April 12, 1848, and that the grant of that date in Villareal's favor is accordingly valid and protected by the Treaty of Guadalupe Hidalgo. This is a far-reaching contention, so we will examine it. It involves the sovereignty of Texas over this territory, and is a direct challenge of that sovereignty at the time this grant was issued.

"One of the things demanded by General Houston of Santa Anna following the victory of San Jacinto was that he require his subordinate commanders the immediate withdrawal beyond the Rio Grande of all Mexican troops in Texas; and this was done. This was the first assertion by the new-born Republic of dominion clear to the utmost Mexican border. On December 19, 1836, the Congress of the Republic declared that the sovereignty of Texas extended to the Rio Grande, defining the southern and western boundary of Texas as beginning at the mouth of that river, and running thence up its principal stream to its source. In the annexation of Texas to the United States as a State, the Rio Grande was accepted as the boundary between Texas and Mexico. It is fair to say that upon no other terms would Texas have consented to the annexation.

"The acceptance of that boundary line was the basis of President Polk's policy in the opening of the war with Mexico. Its dispute by Mexico led to the war. Early in 1846, following the annexation of Texas in the previous December, President Polk ordered General Taylor to advance to the Rio Grande, which he did. The Mexican commander at Matamoros demanded General Taylor's withdrawal to the Nueces. He refused. On April 23rd the Mexicans crossed the river and ambushed a body of American troops. Two weeks later they attacked General Taylor in the Battle of Palo Alto,—May 8, 1846, in which they were repulsed. On the next day Taylor drove them back across the river in a disastrous rout. And on the 18th of May General Taylor crossed the Rio Grande and occupied Matamoros.

"The attack upon the American troops of April 23rd was the occasion of President Polk's message to Congress, declaring that Mexico had passed 'the boundaries of the United States' and had shed American blood 'upon American soil,' and that in consequence a state of war existed.

"The territory between the Nueces and the Rio Grande remained largely under the actual possession and jurisdiction of Mexico until 1846. But after the establishment of Texas independence through the defeat of Santa Anna's army, his recognition of Texas sovereignty, and particularly the resolution of the Congress of the Republic of December 19, 1836, that jurisdiction was never a rightful one. It was but a de facto possession.

"Such as it was came to a complete end when early in 1846 United States troops in behalf of Texas and for the enforcement of her rights with respect to this very area, occupied the territory and ousted the Mexicans from it. This has never been doubted. Not only was Mexican authority at an end in the territory early in 1846, but in September, 1847, United States troops had captured the Mexican capital and the entire country was subject to their arms.

"With no right at all to this territory after 1836, it would be strange to admit the sovereignty of Mexico over it in 1848, when two years before the sovereignty of Texas had been perfected by reducing the territory to possession. It is equally anomalous to contend that in 1848 Mexican de facto possession of it continued, when in 1847 the entire country, with its capital, was in the hands of American troops and the defeat of Mexico an accomplished fact.

"While Mexico's ouster from the territory was in progress, the Legislature of Texas, on April 29, 1846, enacted a joint resolution, declaring:

" 'That the exclusive right to the jurisdiction over the soil in the limits of the late Republic of Texas was acquired by the valor of the people thereof, and was by them vested in the Government of the said Republic, and that such exclusive right is now vested in and belongs to the State, excepting such jurisdiction as is vested in the United States, by the Constitution of the United States, and by the joint resolution of annexation, subject to such regulations and control as the Government thereof may deem expedient to adopt.'

"This was a reaffirmation of the sovereignty of Texas over all territory within the borders of the Republic as defined by the resolution of December 19, 1836, and proclaimed both its rightful and actual jurisdiction over this territory.

"The Treaty of Guadalupe Hidalgo was signed February 2, 1848. *It recognized the Rio Grande River as the boundary between Texas and Mexico, which was a recognition of the right of Texas to the entire area between the Nueces and the Rio Grande.* It stipulated that the civil rights of Mexicans within territory ceded by Mexico, as they existed under the laws of Mexico when the treaty was signed, should be protected.

"The proposition asserted by the claimants under the Mexican title is therefore, that though the jurisdiction of Mexico over this territory was never rightful after 1836; though such jurisdiction as it exercised was terminated early in 1846 by its complete ouster from the territory by American troops,—not only so, but with the entire country of Mexico reduced by September, 1847; and though this grant was issued in April, 1848, more than two months after the signing of the treaty of peace and Mexico's recognition in the treaty of the right of Texas to the territory, still, that a Mexican official, in April, 1848, had authority to exercise the sovereign power of granting away land within it; and that his acts in derogation and repudiation of the sovereignty of Texas, must, in the courts of Texas, be accepted as valid. The proposition largely sets aside the freedom from Mexican rule accomplished by the establishment of Texas independence. It ignores the constant proclamation of both the Republic's and the State's sovereignty over this territory *after December 19, 1836,* and the consummation of their rightful claim by effective possession. It asserts the authority of Mexico to grant land in Texas to which it had no right and of which it had no actual control. *It attempts to extend the protection of the Treaty of Guadalupe Hidalgo to rights not in existence when the treaty was signed, but attempted to be created afterward.* It is refuted by the decisions of this court and plain principles of international law.

"It is a novel proposition to say that a sovereignty having no right to given territory, long after its dispossession, its defeat in a war growing out of dispute over the territory, and its express recognition of the superior right by the provisions of a solemn treaty, may lawfully exercise the sovereign authority of disposing of it by grant. If this be the law a mere de facto jurisdiction over territory once obtained by an unlawful sovereignty, is of greater force, though terminated, than the lawful sovereignty's de jure and de facto possession and control combined. *It is met by the simple proposition that a nation cannot grant away territory to which it has no title.*"

As shown above, this case was carried to the Supreme Court of the United States, where writ of certiorari was denied. However, previous to this opinion, another great Texas judge, Chief Justice Roberts, of the Supreme Court of Texas, in the case of State v. Bustamente, 47 Tex. 320, said:

"Texas claimed the territory, in defining its boundaries *on the 19th day of December, 1836. In 1846, the claim was perfected by possession* and the actual exercise of exclusive jurisdiction, and from that time it was lost by the State of Tamaulipas, in Mexico, for all purposes whatever, whether of judicial action or the exercise of powers relating to eminent domain. And it never afterwards recovered such lost powers."

It thus appears that long prior to the Treaty of Guadalupe Hidalgo the Rio Grande was recognized as the boundary between the Republic of Texas and the Republic of Mexico by the military, executive, legislative and judiciary branches of the governments of the Republic of Texas and of the United States. It is evident that this is true, because if the south boundary of the Republic of Texas had been the Nueces River, then the newly created State of Texas should have extended to that river, and not below it. If the south boundary line were properly located at the Nueces River, then all vacant land between the Nueces and Rio Grande would have belonged to the United States. It would then have necessarily followed that such land would not have belonged to the State of Texas but would have been the property of the United States, and the patents for land within that area would have had their origin in the United States and not in Texas. This Court will take judicial knowledge of the fact that grants for such vacant land between the Nueces and the Rio Grande were issued by the State of Texas. Inasmuch as both the United States and the State of Texas considered and treated such lands between said rivers as the property of Texas, it only remains to consider what the attitude of the Mexican Government was on this subject, and in this connection there is another fact which must be regarded as *conclusive.*

"After the Treaty of Guadalupe Hidalgo, by which the war with Mexico was termi-

nated, the Mexican Commissioners addressed a communication to their government in which they say that 'the intention of making the Bravo a limit has been announced by the clearest signs for *the last twelve years;* and it would have been impossible, at the present day, to change it. After the defeat of San Jacinto, in April, 1836, that was the territory which we stipulated to evacuate, and which we accordingly did evacuate, by falling back on Matamoros. In this place was afterwards stationed what was called the Army of the North, and though it is true that expeditions and incursions have been made there, even as far as Bexar, we have very soon retreated, leaving the intermediate space absolutely free. In this state General Taylor found it when, in the early part of last year, he entered there by order of his government.' With these opinions deliberately expressed by some of the highest functionaries of Mexico, what need is there in pursuing the argument in support of the claim of Texas to the Rio Grande as her southwestern boundary." Life of James Knox Polk, by John S. Jenkins, published in 1850, page 259.

■ Although this lawsuit could well be ended here, inasmuch as from the foregoing it is clearly apparent that the plaintiffs have no legal right to the relief they seek, however, due to the importance of the questions here involved, it is deemed proper to discuss the other points at issue in this controversy.

Under Point 2 defendants say that if the Treaty of Guadalupe Hidalgo is applicable to the facts in this case, then such Treaty should not be construed in such manner as to:

(A) Operate as a discrimination in favor of citizens of Mexico, or

(B) Subject the land in question to the laws of Mexico, but, on the contrary, the maximum rights which the plaintiffs have a right to assert and claim are that they be on an equality with citizens of Texas.

Therefore, the land in question is subject to the laws of the Republic of Texas and its successor in sovereignty, the State of Texas.

Let us now examine the pertinent parts of the Guadalupe Hidalgo Treaty in order to ascertain its purpose and meaning. This treaty, of course, was between the United States of America and the Mexican Republic. In the foreward it speaks of the treaty as "Treaty of Peace, Friendship, limits, and settlement between the United States of America and the Mexican Republic * * * and being in the English and Spanish languages." Still further, it states "* * * wherein the two Peoples should live, as *good Neighbours*." (It is possible that this was the beginning of the use of that now commonly employed term—"good neighbors.")

Art. V of said Treaty states the boundary lines between the two republics as a line commencing at the mouth of the Rio Grande, thence up the middle of that river to the southern boundary of New Mexico, thence by detailed boundaries to the Pacific Ocean.

Art. XII deals with the "ceded territory," and provides for the payment by the United States to the Mexican Republic of Fifteen Million Dollars in consideration of the extension acquired by the United States, as defined in Art. V. This ceded territory did not include any portion of the acknowledged limits of Texas, but the ceded areas for which the consideration was paid under the terms of Art. XII embraced the territories which had, previous to the Treaty, belonged to Mexico, but which under the Treaty would remain within the limits of the United States.

Art. VIII, and particularly the last paragraph thereof, is the part strongly relied upon by the plaintiffs herein. It reads as follows:

"* * * In the said territories, property of every kind, now belonging to Mexicans not established there, shall be inviolably respected. The present owners, the heirs of these, and all Mexicans who may hereafter acquire said property by contract, shall enjoy with respect to it guaranties equally ample as if the same belonged to citizens of the United States."

■ It is on this language that plaintiffs base their claim that the land in question is not subject to the laws of the Republic and State of Texas. They make this claim although more than one hundred years have passed since the Republic of Texas gained its independence, and almost one hundred years have passed since the signing of the Treaty of Guadalupe Hidalgo. They make this claim in the face of the language of the Treaty, last above quoted, in which there is not a word, or combination of words, which would have the meaning or effect of putting an alien

owner of land in this state on a better footing than that of a citizen of the state. The expression "inviolably respected" can mean nothing more than that such properties shall be respected the same as if belonging to citizens of the United States. There is nothing in the Treaty that suggests that the property mentioned in Art. V would not be subject to reasonable regulations in accordance with the property laws of the country where located. The word "equally" means that property in Texas shall be subject to the same laws, and does not mean that one law shall be applicable if the rights of Texans are involved, and an entirely different law should be applicable if the rights of Mexicans are involved. Surely that sentence cannot be logically construed to mean that title to land is subject to the laws of the sovereign Texas when rights of Texans are involved, and subject to the laws of the sovereign Mexico when the rights of Mexicans are involved. Chadwick v. Campbell, 10 Cir., 115 F.2d 401.

What is the meaning of the provision of Art. VIII, "Mexicans not established there," referring to the ceded areas? Clearly, "Mexicans not established there" means Mexicans who would be aliens after the Treaty. In this connection the Supreme Court of the United States, in Ely v. United States, 171 U.S. 220, 18 S.Ct. 840, 848, 43 L.Ed. 142, speaking with regard to Art. VIII of the Treaty, said:

"This government promised to inviolably respect the property of Mexicans. That means the property as it then was, and does not imply any addition to it. The cession did not increase rights."

In the case of Baldwin v. Goldfrank, decided by the Supreme Court of Texas on May 13, 1895, 88 Tex. 249, 31 S.W. 1064, at page 1067, Chief Justice Gaines spoke directly and clearly on this subject, using the following language:

"The provision of the treaty now under consideration *simply* secures Mexicans in their rights of property and guaranties to them, in that respect, the same protection which is extended to citizens of the United States. Article 8 of Treaty (1 Charters & Const. U. S. page 188). The act of February 8, 1850, makes no distinction between citizens of the state or of the United States and citizens of Mexico. Its provisions are extended to all owners of land in the designated counties alike. They were all free to submit the evidences of their respective claims to the board, with a view to their confirmation; or they could repose upon their existing rights. State v. Sais, 47 Tex. 307. It is clear, we think, that this legislation was neither a violation of the treaty of Guadalupe Hidalgo, nor an invasion of any right or reservation secured by the constitution either of the state or of the United States."

In considering the surrounding facts pertaining to the ratification of this Treaty, it is well to bear in mind these well-known facts: Previous to the Treaty of Guadalupe Hidalgo, by the annexation agreement with Texas, it was provided that Texas should retain absolute title and control over the vacant and unappropriated lands within the state. It is very probable that the annexation would not have resulted had such agreement not been made. This annexation took place nearly one hundred years ago, and throughout all that period the United States has consistently maintained a policy of non-interference concerning the lands of and in Texas. In other words, the United States has respected such annexation agreement thoroughly and consistently. It is not logical to believe that it was the intention of the United States to agree to anything in the Treaty of Guadalupe Hidalgo which would in any manner conflict with the annexation agreement made with the Republic of Texas. Directly in line with this contention respecting the sovereign right of Texas to maintain control over its lands, is the attitude of the United States in the negotiations with Mexico which resulted in the adoption of the very treaty now being considered by the court.

In one of the Mexican drafts of the Treaty of Guadalupe Hidalgo, there was an Article X, reading:

"All grants of land made by the Mexican Government or by the competent authorities, in territories previously appertaining to Mexico, and remaining for the future within the limits of the United States, shall be respected as valid, to the same extent that the same grants would be valid, if the said territories had remained within the limits of Mexico. But the grantees of lands in Texas, put in possession thereof, who, by reason of the circumstances of the country since the beginning of the troubles between Texas and the Mexican Government, may have been prevented from fulfilling all the conditions of their grants, shall be under the obligation to fulfill the said conditions within the periods

limited in the same respectively; such period to be now counted from the date of the exchange of ratifications of this treaty; in default of which the said grants shall not be obligatory upon the State of Texas, in virtue of the stipulations contained in this Article.

"The foregoing stipulation in regard to grantees of land in Texas, is extended to all grantees of land in the territories aforesaid, elsewhere than in Texas, put in possession of such grants; and, in default of the fulfilment of the conditions of any such grant, within the new period, which, as is above stipulated, begins with the day of the exchange of ratifications of this treaty, the same shall be null and void.

"The Mexican Government declares that no grant whatever of lands in Texas has been made since the second day of March one thousand eight hundred and thirty-six; and that no grant whatever of lands in any of the territories aforesaid has been made since the thirteenth day of May one thousand eight hundred and forty-six." Miller, Vol. 5, page 242.

After that Article had been stricken by the United States Senate, Secretary of State James Buchanan wrote the Minister of Foreign Relations of the Mexican Republic, in part, as follows:

"The third amendment of the Senate strikes from the Treaty the 10th Article.

"It is truly unaccountable how this article should have found a place in the Treaty. That portion of it in regard to lands in Texas did not receive a single vote in the Senate. If it were adopted, it would be a mere nullity on the face of the Treaty, and the Judges of our Courts would be compelled to disregard it. It is our glory that no human power exists in this country which can deprive one individual of his property without his consent and transfer it to another. If grantees of lands in Texas, under the Mexican Government, possess valid titles, they can maintain their claims before our Courts of Justice. If they have forfeited their grants by not complying with the conditions on which they were made, it is beyond the power of this Government, in any mode of action, to render these titles valid either against Texas or any individual proprietor. To resuscitate such grants and to allow the grantees the same period after the exchange of the ratifications of this Treaty to which they were originally entitled for the purpose of

performing the conditions on which these grants had been made, even if this could be accomplished by the power of the government of the United States, would work manifold injustice.

"These Mexican grants, it is understood, cover nearly the whole sea coast and a large portion of the interior of Texas. They embrace thriving villages and a great number of cultivated farms, the proprietors of which have acquired them honestly by purchase from the State of Texas. These proprietors are now dwelling in peace and security. To revive dead titles and suffer the inhabitants of Texas to be ejected under them from their possessions, would be an act of flagrant injustice if not wanton cruelty. Fortunately this Government possesses no power to adopt such a proceeding." Miller, Vol. 5, page 255.

After the United States Senate had thoroughly considered the treaty, rewriting certain parts and eliminating Article X, the authorities in Washington were very apprehensive in regard to Mexico's attitude toward the rewritten treaty. It was thought that Mexico might refuse to ratify the rewritten treaty.

The United States was very cautious in regard to its method of procedure in its efforts to induce Mexico to accept the treaty. The mission to exchange the ratifications was entrusted to Ambrose H. Sevier, Senator from Arkansas and Chairman of the Senate Committee on Foreign Relations, and Nathan Clifford, Attorney General (subsequently Justice of the Supreme Court of the United States). Sevier resigned as Senator and Clifford as Attorney General, and the two men proceeded to Mexico. These gentlemen were given very detailed instructions by the State Department, a portion of which is quoted below:

"You have been appointed by the President by and with the advice and consent of the Senate, to a most important and responsible mission. The task has thus been assigned to you of consummating the Treaty of Peace which was signed at Guadalupe Hidalgo on the second day of February, last, between the United States and the Mexican Republic, and which, on the 10th instant, was ratified by the Senate with amendments.

"This brief statement will indicate to you clearly the line of your duty. You are not sent to Mexico for the purpose of negotiating any new Treaty or of changing in any

particular the ratified Treaty which you will bear with you. None of the amendments adopted by the Senate can be rejected or modified except by the authority of that Body. Your whole duty will then consist in using every honorable effort to obtain from the Mexican Government a ratification of the Treaty in the form in which it has been ratified by the Senate, and this with the least practicable delay. * * *

"Should you find it impossible, after exhausting every honorable effort for this purpose, to obtain the ratification from the President and Congress of Mexico of the Treaty as it has been amended by the Senate, it may then become necessary for you in conversation with the proper Mexican authorities to express an opinion as to what portion of the Senate's amendments they might probably be willing to yield for the sake of restoring peace between the two Republics. This will be a very delicate duty; but upon one point, at least, you will be relieved from all embarrassment. Neither the President nor the Senate of the United States can ever consent to ratify any Treaty containing the tenth article of the Treaty of Guadalupe Hidalgo in favor of grantees of lands in Texas or elsewhere. The Government of the United States do not possess the power to carry such an article into execution; and if they did, it would be highly unjust and inexpedient. Should the Mexican Government persist in retaining this article, then all prospect of immediate peace is ended; and of this you may give them an absolute assurance." Miller, Vol. 5, page 374.

It is difficult to conceive of clearer language. Again the United States recognizes its obligations and duties respecting Texas. Attention is directed to the fact that it is stated that "the Government of the United States do not possess the power to carry such an article into execution."

■ Why didn't the United States possess that power? It was because of its contractual obligations, as set forth in the agreement of annexation with Texas. The United States recognized that in view of the annexation agreement, Texas was the superior sovereign, so far as land and land titles in Texas were concerned. It is a fundamental proposition of the common law that real property is exclusively subject to the laws of the government or sovereign within whose territory it is situated, and the United States recognized that it could not hamper Texas in its jurisdiction of land.

It is most significant that the instructions also stated that "all prospect of immediate peace is ended" if Mexico insisted upon the United States making a treaty which violated the rights of Texas.

The two commissioners referred to above, contrary to written instructions, and without any authority, executed a protocol on May 26, 1848. A portion of that protocol reads:

"Second.

"The American Government by suppressing the Xth article of the Treaty of Guadalupe Hidalgo did not in any way intend to annul the grants of land made by Mexico in the ceded territories. These grants, notwithstanding the suppression of the articles of the Treaty, preserve the legal value which they may possess; and the grantees may cause their legitimate titles to be acknowledged before the American tribunals.

"Conformably to the law of the United States, legitimate titles to every description of property, personal and real, existing in the ceded territories, are those which were legitimate titles under the Mexican law in California and New Mexico up to the 13th day of May, 1846, and in Texas up to the 2d March, 1836." Miller, Vol. 5, page 381.

The authorities in Washington resented the fact that the American Commissioners had signed the protocol, but having been signed, it was necessary for the State Department to go on record to the effect that the same was not authorized and that it did not correctly interpret the treaty. Various notes and communications were exchanged between the two nations, and the final result was that the protocol is not now regarded, in a legal sense, as a part of the Treaty of Guadalupe Hidalgo, or obligatory as an international act. Miller, Vol. 5, page 405.

The final word in regard to the protocol was contained in an instruction written by Secretary of State, John M. Clayton, to Robert P. Letchner, the successor of Nathan Clifford, as Minister to Mexico. A part of the written instruction reads:

"The next subject of the Protocol relates to the suppression of the Xth Article of the original Treaty.

"The object and effect of this article was to revive those lavish grants of land by the Mexican Government, not only in the State of Texas, but in the territories which had not been by law incorporated into the United States at the date of the Treaty. It is notorious that these grants, though embracing vast tracts of territory and imposing nominal burthens only on the grantees, were forfeited by them from failure to comply with their conditions. By the very terms upon which the State of Texas had been admitted into the Union, the article was entirely nugatory so far as it related to lands within her limits. To have consented to it, would have been a breach of faith on the part of this government towards her, which must have provoked her just resentment and might have led to resistance on her part to its execution, which there would not have been moral means at the command of this government successfully to oppose. I fully concur in the sentiment expressed by Mr. Buchanan in his letter to the Mexican Minister for Foreign Affairs of the 18th of March, 1848, that it is difficult to conjecture how an article of this character would have obtained a place in the Treaty. * * *" Miller, Vol. 5, page 401.

In the work by Miller which is quoted, he concludes his discussion of the protocol which was signed by Sevier and Clifford by making the following statement:

" * * * Articles 9 and 12 of the treaty were long since fully executed, without occasion having arisen for consideration of the statements of the protocol as to their meaning and effect; and insofar as it dealt with the deleted Article 10, the protocol, strictly speaking, did not, and did not purport to, interpret or construe a treaty text, for none existed for interpretation; all that the protocol did in its item 'Second' (particularly in the second paragraph thereof) was to record the opinion of the two American lawyers who signed it on the law of their country regarding titles to land in Texas and in California and New Mexico. One fundamental error of that opinion was its reference to Texas, an independent Republic since 1836, recognized as such by the United States in 1837, and one of the States of the American Union since 1845, as territory ceded to the United States by the Treaty of Guadalupe Hidalgo; and with that opinion of Sevier and Clifford there may profitably be compared the statements of the Supreme Court of the United States in relevant cases; among these are McKin-

ney v. Saviego, 18 How. 235, 15 L.Ed. 365 (December Term, 1855), wherein it was held, without mention of the protocol of May 26, 1848, that in Article 8 of the Treaty of Guadalupe Hidalgo the contracting parties 'did not refer to any portion of the acknowledged limits of Texas.' * . * *" Miller, Vol. 5, page 405.

Note Miller's significant statement that the fundamental error committed by the two gentlemen was that they referred to Texas as "ceded territory." He then cites McKinney v. Saviego, 18 How. 235, 15 L. Ed. 365, to support his statement that the treaty did not apply to Texas.

Defendants make three other points with reference to their theory that the Treaty of Guadalupe Hidalgo did not apply to Texas land. They are as follows:

Point 3. Where there is a change of government, the laws of the new government control the acquisition, disposition and devolution of real estate, and the laws of the old government are immediately replaced.

Point 4. Real property is exclusively subject to the laws of the Government within whose territory it is situated.

Point 5. The title and modes of disposition of real estate within the states are not matters placed under the control of Federal authority.

Defendants cite in support of their theories, the following authorities: Elisha Basse v. City of Brownsville, 154 U.S. 610, 14 S.Ct. 1195, 22 L.Ed. 420; Chicago R. I. & P. R. Co. v. McGlinn, 114 U.S. 542, 5 S.Ct. 1005, 29 L.Ed. 270; Erwin v. Holliday, 131 Tex. 69, 112 S.W.2d 177; McKinney v. Saviego, 18 How. 235, 15 L.Ed. 365; Oakey v. Bennett, 11 How. 33, 13 L. Ed. 593; Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565; Restatement of the Law of Conflict of Laws: 9 Tex.Jur. 359; United States v. Crosby, 7 Cranch 115, 3 L.Ed. 287; United States v. Fox, 94 U.S. 315, 24 L.Ed. 538; Vilas v. Manila, 220 U.S. 345, 31 S. Ct. 416, 55 L.Ed. 491; Waterman v. Charlton, 102 Tex. 510, 120 S.W. 171.

These points are only another way of stating that the Treaty of Guadalupe Hidalgo did not in any sense supersede the sovereign right of Texas to control the acquisition, disposition and devolution of real property within the State of Texas.

Prior to annexation, Texas as a republic had complete control of all land within its borders. It issued patents for vacant land, and that land which was privately

owned was subject to its laws. The law on this subject is summarized in the following quotation from 15 C.J.S., Conflict of Laws, § 19, page 936:

"Immovable property is exclusively subject to the laws of the government within whose limits it is located, and it is a rule firmly established by numerous decisions that the law of the jurisdiction in which such property is situated controls and governs its acquisition, disposition, and devolution. This rule which is embodied in the Restatement, is universal, applying generally to all property classed as immovable, and operates between the several states of the United States as well as between countries entirely foreign to each other. It is not in the power of any state by any legislative act to prescribe the mode in which lands in another state may be disposed of or title thereto passed from one person to another."

The same rule is laid down in 9 Tex.Jur. 359:

"Sec. 9. Real Property. It is the settled doctrine of the common law that real property is exclusively subject to the laws of the government within whose territory it is situated. Hence, as a general rule, title to land can be affected only by the lex loci rei sitae, and this law is to be referred to for the purpose of determining the validity of every transfer or disposition of real estate, whether by deed, will, descent, or judicial proceedings. The laws of the country or state where the property is located also govern exclusively the construction and effect of all instruments intended to convey it. If a contract refers to realty, it is construed and applied by the law of the place where the land is located, without reference, so far as the title is concerned, to the law of the place of the contract."

In 1812 the Supreme Court of the United States, in the case of United States v. Crosby, 7 Cranch, 115, 116, 3 L.Ed. 287, established the above rule, using the following language:

"The question presented for consideration, is whether the lex loci contractu or the lex loci rei sitæ is to govern in the disposal of real estates.

"The Court entertain no doubt on the subject; and are clearly of opinion that the title to land can be acquired and lost only in the manner prescribed by the law of the place where such land is situate. The judgment of the Circuit Court must, therefore, be affirmed."

The same rule was followed in 1850 in a case involving real estate in Texas. Oakey v. Bennett, 1850, 11 How. 33, 44, 13 L.Ed. 593:

"But it is an admitted principle in all countries where the common law prevails, whatever views may be entertained in regard to personal property, that real estate can be conveyed only under the territorial law. The rule is laid down clearly and concisely by Sir William Grant, in Curtis v. Hutton, 14 Ves. 537, 541, where he says: 'The validity of every disposition of real estate must depend upon the law of the country in which that estate is situated.' The same rule prevails generally in the civil law. Boullenois, John Voet, Christinæus, and others (cited in Story, Conflict of Laws, 359, 360) say, 'As a general rule, movable property is governed by the law of the domicile, and real property by the law of the situs rei.' "

Attention is called to the fact that the above quotation contains a statement that the rule obtains in the civil law. Spain and Mexico are civil law nations. This fact alone should defeat this law suit. Texas, by gaining her independence, thereby removed Mexican domination. This fact weighs heavily against the plaintiffs in this law suit. Texas gained her independence through a revolution and removed Mexican domination. Mexico had theretofore, on September 27, 1821, likewise gained its independence from Spain through a revolution. And, of course, the United States, long prior thereto, had gained its independence from England by a revolution.

The United States has, from the very beginning, recognized that it does not have the power to control private land titles within the states. United States v. Fox, 1876, 94 U.S. 315, 320, 24 L.Ed. 192:

"The power of the State to regulate the tenure of real property within her limits, and the modes of its acquisition and transfer, and the rules of its descent, and the extent to which a testamentary disposition of it may be exercised by its owners, is undoubted. It is an established principle of law, everywhere recognized, arising from the necessity of the case, that the disposition of immovable property, whether by deed, descent, or any other mode, is exclusively subject to the government within whose jurisdiction the property is situated. McCormick v. Sullivant, 10 Wheat. [192], 202 [6 L.Ed. 300]. The power of the State

in this respect follows from her sovereignty within her limits, as to all matters over which jurisdiction has not been expressly or by necessary implication transferred to the Federal government. The title and modes of disposition of real property within the State, whether inter vivos or testamentary, are not matters placed under the control of Federal authority. Such control would be foreign to the purposes for which the Federal government was created, and would seriously embarrass the landed interests of the State."

Additional authorities on the same subject are: Pennoyer v. Neff, 1877, 95 U.S. 714, 24 L.Ed. 565; Erwin v. Holliday, 1939, 131 Tex. 69, 112 S.W.2d 177; Waterman v. Charlton, 102 Tex. 510, 120 S.W. 171; Restatement of the Law of the Conflict of Laws.

It is true that the treaty making power is, by the Constitution, placed in the Federal Government, but that Government, as evidenced by the Acts of the executive, legislative and judicial branches, has always recognized the sovereign rights of the respective states to control private land titles within the states. It is inconceivable that the United States, by means of the Treaty of Guadalupe Hidalgo, would have attempted to take away from Texas any of its sovereign rights respecting land.

Texas is the only one of the forty-eight states to enter the Union as an independent nation. In making Texas, the Republic, an offer of annexation the United States agreed that Texas, the State, "shall also retain all vacant and unappropriated lands lying within its limits * * * to be disposed of as said State may direct." It is, therefore, illogical to say that Texas has not such right and that all of the other forty-seven states do have such right. In view of the repeated statements of the Supreme Court of the United States, both before and after annexation and the Treaty of Guadalupe Hidalgo, it is most unreasonable to argue that the Treaty of Guadalupe Hidalgo in any way takes away any of the sovereign rights of Texas respecting land.

In 1840 the common law was adopted by the Republic of Texas. On February 5, 1841, the Fifth Congress of the Republic of Texas enacted the three, five and ten year statutes of limitation. Upon this Act has been built the entire system of title by limitation in Texas to real estate. When that Act became effective in 1841,

the land in question immediately became subject thereto.

The new laws of the Republic of Texas had the effect of abrogating the laws of the former sovereign. The plaintiffs in this case contend to the contrary. They say that this land is still controlled by the laws of Spain and Mexico. They say the adoption of the common law in 1840, and the statutes of limitation in 1841, do not affect this claim. The authorities are to the contrary.

Vilas v. Manila, 220 U.S. 345, 31 S.Ct. 416, 419, 55 L.Ed. 491:

"That there is a total abrogation of the former political relations of the inhabitants of the ceded region is obvious. That all laws theretofore in force which are in conflict with the political character, constitution, or institutions of the substituted sovereign, lose their force, is also plain. Alvarez y Sanchez v. United States, 216 U.S. 167, 30 S.Ct. 361, 54 L.Ed. 432. But it is equally settled in the same public law that that great body of municipal law which regulates private and domestic rights continues in force until abrogated or changed by the new ruler. * * *"

The United States knew that Texas had, in 1840, adopted the common law, and all of the law discussed under these points were a part of the common law. The United States knew Texas limitation statutes had been enacted. Was it the intention of the United States, by means of the Treaty of Guadalupe Hidalgo, to wipe those laws out of Texas law books where the rights of Mexican citizens were involved? That would be the rankest kind of discrimination in favor of Mexicans. It would likewise have been a discrimination against Texas as compared to the other states of the Union.

For nearly one hundred years all branches of the State and Federal Governments have construed the Treaty of Guadalupe Hidalgo to mean the exact opposite from that contended by the plaintiffs in this case. That construction is now a part of this Treaty. If it be wrong, then the only possible chance the plaintiffs have is to prevail on their government to negotiate another treaty, and then if we assume that our Federal Government was inclined to negotiate another treaty, it would be confronted with the supreme sovereign right of Texas concerning its own land.

It is not surprising that the Supreme Court of the United States has said that the

Treaty of Guadalupe Hidalgo has no application to Texas. Not one law did Congress enact for the purpose of testing, in Texas, the titles which had a Spanish or Mexican origin. For the territory now embraced within the present States of New Mexico, Arizona and California, Congress passed laws in order to carry into effect the Treaty of Guadalupe Hidalgo, and by such laws commissions were created, surveyors appointed and appeals to the courts provided. Nothing of that character was ever done for Texas. All the reported Federal cases are those which concerned land in the present states of New Mexico, Arizona and California. On the two occasions when the Supreme Court of the United States did consider the Treaty with reference to Texas, it simply said that it did not apply to Texas. McKinney v. Saviego, 18 How. 235, 15 L.Ed. 365; Elisha Basse v. City of Brownsville, 154 U.S. 610, 14 S.Ct. 1195, 22 L.Ed. 420.

This position or conduct on the part of the United States should be decisive of this case. It means that this Court as a Federal Court, primarily interested in enforcing and construing treaties made by the Federal Government, should follow the Supreme Court of the United States and ignore the Treaty of Guadalupe Hidalgo. As has been pointed out, the decisions of the Supreme Court of the United States are in conformity with the conduct and acts of the legislative and executive departments of the Federal Government. This course of conduct has been consistent for nearly one hundred years. Probably the most significant point respecting the conduct of the Federal Government is that it has been in keeping with the common law and the annexation agreement. The Federal Government consistently maintained a strict "hands off" policy in regard to land and land titles in Texas.

■ Defendants also strongly urge what they denominate Point No. 6: "If the plaintiffs ever had any title, the same has been lost because of the three years statute of limitation. (Art. 5507, R.S. of Texas)"

In considering this point it is well to remember that this three year statute of limitation was first enacted by the Fifth Congress of the Republic of Texas in 1841, in the following language:

"Sec. 15. Be it further enacted, That every suit to be instituted to recover real estate, as against him, her or them, in possession under title, or color of title, shall be instituted within three years next after the cause of action shall have accrued, and not afterwards; but in this limitation, is not to be computed the duration of disability to sue from the minority, coverture, or insanity of him, her or them having cause of action. By the term title, as used in this section, is meant a regular chain of transfer from or under the sovereignty of the soil: and color of title is constituted by a consecutive chain of such transfer down to him, her or them in possession, without being regular, as if one or more of the memorials or muniments be not registered, or not duly registered, or be only in writing, or such like defect as may not extend to, or include the want of intrinsic fairness and honesty, or when the party in possession shall hold the same by a certificate of headright, land warrant or land scrip, with a chain of transfer down to him, her or them in possession; and provided, this section shall not bar the right of the government."

The present law reads:

"Article 5507. Suits to recover real estate, as against a person in peaceable and adverse possession thereof under title or color of title, shall be instituted within three years next after the cause of action accrued, and not afterward. Acts 1841, p. 119; P.D. 4622; G.L. vol. 2, p. 621."

"Article 5508. By the term 'title' is meant a regular chain of transfers from or under the sovereignty of the soil, and by 'color of title' is meant a consecutive chain of such transfers down to such person in possession, without being regular, as if one or more of the memorials or muniments be not registered, or not duly registered, or be only in writing, or such like defect as may not extend to or include the want of intrinsic fairness and honesty; or when the party in possession shall hold the same by a certificate of headright, land warrant, or land scrip, with a chain of transfer down to him in possession. Id."

The defendants have included in their motion for summary judgment only the record title beginning with Robert Driscoll in 1886. This part of the record included two junior patents from the State of Texas to Robert Driscoll, and such defendants' chain of title is briefly summarized as follows:

"Defendants' Chain of Title

"Exhibit 1.

Recorded Vol. R, page 158, dated 8/18/86, filed 9/8/86/ Deed, D. C. Rachal and Henry Scott to J. and R. Driscoll, covers 31,000 acres, of which the land in question is a part.

"Exhibit 2.

"Recorded Vol. 65, page 87, dated 9/2/10, filed 9/3/10, An Affidavit to the effect that Robert and Jerry Driscoll were brothers, and Jerry was sometimes known as Jeremiah. Prior to 10/11/99, J. Driscoll was a widower and had three children: Birdie, Laura and Catherine.

"Exhibit 3.

"Recorded Vol. U, page 553, Partition Judgment, dated 10/11/89, filed 10/27/90, Robert Driscoll vs. Jeremiah, Birdie, Laura and Catherine Driscoll, (445). By this partition Robert Driscoll, Sr., acquired title to all the land in Nueces County.

"Exhibit 4.

"Recorded Vol. 13, page 55, 4/15/04, judgment, The State of Texas vs. (18,378) Robert Driscoll, et al. By this judgment title out of the sovereign is confirmed in the defendants. Particular reference is made to the tract granted to Mariano Lopez de Herrera, and a detailed metes and bounds description is made of the land.

"Exhibit 5.

"Recorded Vol. 217, page 464, patent, dated 10/2/05, filed 10/19/35, State of Texas to Robert Driscoll, et al, covers 20,602 acres, is based on Exhibit 4.

"Exhibit 6.

"Vol. 13, page 61, dated 4/15/04, filed 10/3/04, a judgment, the State of Texas vs (18,375) C. J. Allen, Robert Driscoll, et al, by this judgment title out of the sovereign is confirmed in the defendants; particular reference is made to the Joaquin Lopez de Herrera grant and a detailed metes and bounds description is made of the land.

"Exhibit 7.

"Recorded Vol. 209, page 603, Patent, dated 10/2/05, filed 9/8/1934, State of Texas to Robert Driscoll, et al. Covers 18,375 acres, is based on judgment, Exhibit 6, and confirms grant out of Joaquin Lopez de Herrera, of date 4/9/1806.

"Exhibit 8.

"Vol. 48, page 357, Power of Attorney, dated 11/1/08, filed 5/16/09, R. Driscoll to R. Driscoll, Jr., authorizes the son to execute deeds for and in behalf of the father.

"Exhibit 9.

"Vol. 54, page 200, Deed, filed 10/26/09, dated 3/4/09, R. Driscoll by R. Driscoll, Jr. to W. L. Dusenbery, Covers NW 1/4 of SE 1/4.

"Exhibit 10.

"Vol. 54, page 265, Deed, dated 3/4/09, filed 11/2/09, W. L. Dusenbery to Walter P. Sonderup. Covers same land.

"Exhibit 11.

"Vol. 84, page 267, Deed, dated 6/14/12, filed 9/13/12, Walter P. Sonderup et ux Nanna J. to A. N. Parr. Covers same land.

"Exhibit 12.

"Vol. 54, page 198, Deed, dated 4/23/09, filed 10/26/09, R. Driscoll by R. Driscoll, Jr., to W. L. Dusenbery. Covers SE 1/4 of SE 1/4.

"Exhibit 13.

"Vol. 54, page 267, Deed, dated 4/23/09, filed 11/2/09, W. L. Dusenbery to Walter P. Sonderup. Same land.

"Exhibit 14.

"Vol. 84, page 275, Deed, dated 6/14/12, filed 9/13/12, Walter P. Sonderup et ux Nanna J., to A. N. Parr, same land.

"Exhibit 15.

"Vol. 54, page 206, Deed, dated 4/23/09, filed 10/26/09, R. Driscoll by R. Driscoll, Jr., to W. L. Dusenbery. Covers NE 1/4 of SE 1/4.

"Exhibit 16.

"Vol. 54, page 268, Deed, dated 4/23/09, filed 11/2/09, W. L. Dusenbery to Walter P. Sonderup. Same land.

"Exhibit 17.

"Vol. 84, page 264, Deed, dated 6/14/12, filed 9/13/12, Walter P. Sonderup et ux Nanna J., to A. N. Parr. Same land.

"Exhibit 18.

"Vol. 54, page 203, Deed, dated 4/23/09, filed 10/26/09, R. Driscoll by R. Driscoll, Jr., to W. L. Dusenbery. Covers SW 1/4 of SE 1/4.

"Exhibit 19.

"Vol. 54, page 270, Deed, dated 4/23/09, filed 11/2/09, W. L. Dusenbery to Walter P. Sonderup.

"Exhibit 20.

"Vol. 84, page 270, Deed, dated 6/14/12, filed 9/13/12, Walter P. Sonderup et ux, Nanna J., to A. N. Parr. Same land.

"Note: This gives A. N. Parr entire SE 1/4.

"Exhibit 21.

"Vol. 201, page 621, Sp. Deed, dated 8/19/32, filed 8/25/32, A. N. Parr et ux Sudie E., to:

| | |
|---|---|
| Margaret Lillian Parr. | Surface and 1/5 M. I. |
| W. N. Parr | 1/5 M. I. |
| R. S. Parr | 1/5 M. I. |
| Walter L. Parr | 1/5 M. I. |

"Exhibit 22.

"Vol. 50, page 624, Lease dated 5/13/39, filed 5/25/39, A. N. Parr et ux Sudie E., to Stanolind Oil and Gas Company. Covers NE 1/4 of SE 1/4.
SW 1/4 of SE 1/4
N 1/2 of SE 1/4 of SE 1/4

"Exhibit 23.

"Vol. 52, page 540, Agreement, dated 5/23/39, filed 8/2/39, A. N. Parr et ux and all the children to Stanolind Oil and Gas Company. Parrs agree that bonus money and delay rentals shall be paid to A. N. Parr.

"Exhibit 24.

"Vol. 62, page 250, Deed dated 11/29/09, filed 8/4/10, R. Driscoll by R. Driscoll, Jr., to W. L. Dusenbery. Covers SW 1/4.

"Exhibit 25.

"Vol. 65, page 92, deed dated 11/29/09, filed 7/5/10, W. L. Dusenbery to Hulda C. Mock and Daniel Mock. Same land.

"Exhibit 26.

"Vol. 124, page 485, Deed dated 11/1/18, filed 1/11/19, Daniel and Hulda Mock to Walter Bock. Same land.

"Exhibit 27.

"Vol. 23, page 45, Deed dated 9/27/29, filed 12/26/31, Walter and Minnie Bock to Hilmar Bock. Covers S 1/2 of SW 1/4.

"Exhibit 28.

"Vol. 50, page 593, Min. deed dated 5/16/39, filed 5/23/39, Hilmar Bock and Minnie Bock, a widow, to Stanolind Oil and Gas Company. Covers 1/4 interest in minerals in S 1/2 of SW 1/4.

"Exhibit 29.

"Vol. 203, page 45, Deed dated 9/27/29, filed 12/26/31, Walter Bock et ux, Minnie, to Bruno Bock. Covers N 1/2 of SW 1/4.

"Exhibit 30.

"Vol. 50, page 590, R. Deed, dated 5/16/39, filed 5/23/39, Bruno Bock et ux, Erna, and Minnie Bock, a widow, to Stanolind Oil and Gas Company. Covers 1/8 R. I. in same land."

It will be observed that the southeast quarter of section forty-four has been owned by the A. N. Parr family continuously since 1912 and the southwest quarter has been owned by the Mock and then the Bock families since 1909. Exhibits 37 to 43 are detailed affidavits of adverse possession, and it will be observed from the affidavits, that during practically the entire period covered by such affidavits, the land in question was nearly one hundred percent in cultivation.

At various times the Texas Legislature enacted laws which authorized landowners, whose titles originated by grants from Spain or Mexico, to test the validity of their titles by suits against the State of Texas. In most instances those laws also authorized the State to sue the claimants of land who had titles originating with the same source.

An Act of the 27th Legislature of Texas, Acts 1901, 1st called Sess., c. 4, entitled "An Act to provide for ascertaining and adjudicating certain claims against or in favor of the State for lands, titles to which are claimed to have emanated from the Spanish or Mexican government; to adjust and settle the rights of the State and the owners or claimants respectively of such lands, and if found valid, to confirm as against the State, the right and title of such claimants or owners, and to provide for the patenting of the same, when title thereto has been confirmed by suit or otherwise; and for the recovery thereof by the State when the claimant has no title thereto," which was approved September 3, 1901, authorized suits of the character described in the previous paragraph. Based on that Act, the State of Texas

brought suit No. 18,378, against Robert Driscoll for the purpose of testing the validity of the Mariano Lopez de Herrera grant. Judgment was rendered against the State on April 15, 1904, as indicated by Exhibit 4.

A similar suit, No. 18,375, was filed against Robert Driscoll to test the validity of the Joaquin Lopez de Herrera grant. As indicated by Exhibit 6, judgment was likewise rendered against the State, in that case on April 15, 1904. Following the judgments, the State of Texas, on October 2, 1905, issued patents to Robert Driscoll covering the identical land described in the two Spanish grants above referred to, Exhibits 5 and 7. It thus appears that the two patents are supported by a legislative act and judgments against the State. As indicated by the chain of title, there is an unbroken record title from Robert Driscoll to the fee owners, Parrs and Bocks, and to these defendants, as owners of a part of the minerals.

The leading case on the point that junior patents can be made the basis of the three year statute of limitation is Campbell v. Gibbs, Tex.Civ.App., 161 S.W. 430, 436 (writ of error denied, 165 S.W. XV). In that case Campbell, as plaintiff, claimed title to land based on grants from the Government of Coahuila and Texas in 1832, to Gordiano Badilla. The same land was afterwards covered by patented locations of the Republic and State of Texas, and the defendants claimed under said junior patents. The defendants also relied upon the three years statute of limitation. The trial court concluded that the defendants had perfected a limitation title under the three years statute and rendered judgment in their favor. In affirming the judgment of the trial court, the Appellate Court said:

"But it is contended by appellants that the land had been granted to Gordiano Badilla by a former sovereignty, and had never been subject to the sovereignty of the republic or state of Texas, and that therefore (1) the provisions of the three-year statute of limitation as to title or color of title from the sovereignty is not met by showing such title under the republic or state of Texas, and (2) that, if the provision of the statute were so construed as to meet this case, it was beyond the power of the Legislature thus to divest the title under the former sovereignty. Neither of these contentions is sound. The state has always shown a religious regard for valid titles emanating from any former sovereign. *When such grants are placed upon the same footing as those made by the state herself, it certainly cannot be said that any rights, whether originating by treaty or under the Constitution or laws of this state, have been violated.* There is nothing in the nature of those rights to protect them from the operation of the statutes of limitation adopted for the settlement of land titles. The 'sovereignty of the soil' in the three-year statute meant, when the statute was first adopted in 1841, the then existing sovereignty. The change from the republic to the state wrought no change in the sovereignty except to transfer it to the state, the present sovereign. * * *

"But in the case of junior patents, upon lands previously titled by the state, it seems to be well settled that such junior patentees or persons holding title under them hold under the sovereignty of the soil, and may prescribe under the statute of limitation of three years as against the holder under the senior patent. Whitehead v. Foley, 28 Tex. [1], 14; Smith v. Power, 23 Tex. 29; League v. Rogan, 59 Tex. [427], 431; Galan v. Town of Goliad, 32 Tex. 776; Land Mortgage Co. v. State, 1 Tex.Civ. App. 616, 23 S.W. [258], 259."

Other cases in point, other than the cases cited in Campbell v. Gibbs, supra, are: Houston Oil Co. of Texas v. Wm. M. Rice Institute, Tex.Civ.App., 194 S.W. 413, (writ of error refused.); 2 Tex.Jur. 296, and Allen v. Draper, Tex.Com.App., 254 S.W. 783.

It therefore follows that, inasmuch as the three-year statute of limitation was in existence before the Treaty of Guadalupe Hidalgo, and the land in this suit was, before such Treaty, subject to such three-year statute of limitation, that said Treaty did not nullify this statute.

It is also seen from the above authorities that the junior patents issued to Robert Driscoll by the State of Texas were valid, and the said Robert Driscoll and his predecessors in title, and these defendants, have had thirty-one years of peaceable and adverse possession of such land. The present attitude of the Supreme Court of the United States is in line with this point, as is indicated in an opinion handed down on June 18, 1945, in the case of Guaranty Trust Co. of New York v. York, 65 S.Ct. 1464, 1471, in a case involving the statute of limitations of the State of New York, in which it is stated:

"The source of substantive rights enforced by a federal court under diversity jurisdiction, *it cannot be said too often, is the law of the States.*"

Defendants urge as Point 7: If the plaintiffs or their ancestors ever had any title, the same has been abandoned.

Since this Court, speaking through Judge Kennerly, in T. H. Mastin & Co. v. Kirby Lumber Co., D.C., 15 F.Supp. 429, at page 437, said: "It has long been the law in Texas, as in many other states, that facts will be presumed in support of an active title, but not in support of a dormant or inactive one," and collates in connection therewith a great number of cases from both the Supreme Court of the United States and the Supreme Court of Texas, to all of which cases reference is here made, it is not believed that further time or space should be given to the consideration of that point. This is particularly true in view of the fact that the affidavits filed on behalf of the defendants herein *have not been contradicted* by the plaintiffs. The Mastin case also cites with approval Allen v. West Lumber Co., Tex.Com.App., 244 S.W. 499.

■ Let us now consider what defendants denominate their Point 8: If the plaintiffs ever had any title, the same has been lost by reason of the five, ten and twenty-five years statutes of limitation.

On this point this Court believes that it is sufficient to merely refer to Article 5509, Vernon's Ann.Civ.St.Tex. having to do with the five-year statute of limitation, and Article 5510, having to do with ten years possession, and Article 5519, which treats of actions that are barred after twenty-five years.

Under the evidence referred to above, defendants have shown a compliance with all three of these statutes, and are, therefore, under Article 5513, shown to have:

"* * * Full title, precluding all claims. * * *"

■ We now give consideration to the last point urged as a defense by the defendants herein:

Point 9. The plaintiffs' petition shows that they and their ancestors have not for a period of one hundred years claimed the land, and the evidence shows that they, with knowledge of their rights, acquiesced in the possession and assertion of title by the defendants and those under whom they claim, and under such circumstances the court should presume a grant (or conveyance or deed) from the plaintiffs, or their ancestors, to the defendants or their predecessors in title.

In support of this point, defendants cite a number of cases, however, this Court only considers it necessary to discuss two cases, one by the Supreme Court of the United States and the other by the Supreme Court of Texas.

In Magee v. Paul, 110 Tex. 470, 221 S. W. 254, 256, it is said:

"Since it is not consistent with human experience for one really owning property of value to assert no claim thereto, but to acquiesce for a long period of time in an unfounded, hostile claim, the rule is sound which permits the inference that an apparent owner has parted with his title from evidence, first, of a long-asserted and open claim, adverse to that of the apparent owner; second, of nonclaim by the apparent owner; and third, of acquiescence by the apparent owner in the adverse claim.

"The rule is essential to the ascertainment of the very truth of ancient transactions. Without it, numberless valid land titles could not be upheld. Its application becomes more and more important with the passing years, as it becomes more and more difficult to get living witnesses to that which long ago transpired."

Referring back to the first paragraph of the above quoted case, it will be noted that there are three elements to the presumption of a grant:

"First, of a long-asserted and open claim, adverse to that of the apparent owner."

In support of this element the defendants have filed affidavits of adverse possession which show actual possession of this land from 1886 to 1943. The claims of the defendants are likewise supported by numerous recorded deeds constituting the chain of title. It should be kept in mind that the record title disclosed by the exhibits to the motion includes the patents from the State of Texas to Robert Driscoll.

The second element which must be present in order to support the presumption is of "non-claim by the apparent owner." The strongest evidence of non-claim on the part of plaintiffs is their petition. *It discloses a period of non-claim for more than one hundred years.*

The third element is "of acquiescence, by the apparent owner, in the adverse

claim." The law is that there cannot be acquiescence without knowledge. The plaintiffs rely, to a great extent, on the archived instruments in the custody of the President of the City of Camargo, Mexico. In their motion for summary judgment, the plaintiffs state that the records in Camargo show the Spanish grants, the conveyance to Pedro Ygnacio Garcia and all information in regard to marital status, deaths and heirship covering the five generations which followed him. *Plaintiffs have had knowledge, therefore, they could and they have acquiesced.*

And, finally, on this point, see United States v. Chavez, 175 U.S. 509, 20 S.Ct. 159, 163, 44 L.Ed. 255:

" '* * * Presumptions of this nature are adopted from the general infirmity of human nature, the difficulty of preserving muniments of title, and the public policy of supporting long and uninterrupted possessions. They are founded upon the consideration that the facts are such as could not, according to the ordinary course of human affairs, occur, unless there was a transmutation of title to, or an admission of an existing adverse title in, the party in possession.' It is not necessary therefore, in the cases mentioned, for the jury, in order to presume a conveyance, to believe that a conveyance was in point of fact executed. It is sufficient if the evidence leads to the conclusion that the conveyance might have been executed, and that its existence would be a solution of the difficulties arising from its non-execution. * * *"

On the subject of whether or not plaintiffs' motion for summary judgment should be granted, in addition to what has heretofore been said, defendants attack the affidavits of the plaintiffs because, they say, they are not the best evidence of written instruments which affiants attempt to describe; because they contain conclusions and opinions and not actual facts personally known to affiants; and that they, in some places, contain interpretations made by the affiants. Also, defendants say that the plaintiffs have neither plead nor offered proof of the laws of Mexico, nor of the accuracy of the alleged translations, nor of the authenticity of claimed certificates. They further say that the question of testacy or intestacy is not one of pedigree and, therefore, cannot be covered by the rule with reference to hearsay proof. On this latter question they cite the case of Smith v. Kenney, Tex.Civ.App., 54 S.W. 801.

They further say that ancestry and heirship are matters of fact, to be proven, as is the question of whether or not any administrators were necessary on the estates of the claimed ancestors of the plaintiffs herein. See Youngs v. Youngs, Tex.Com. App., 26 S.W.2d 191. In this connection Section (e) of Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, reads:

"(e) Form of Affidavits; Further Testimony. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions or by further affidavits."

All matters of record herein should be shown as fully as possible, because it is well known, as said in the case of State v. Sais, 60 Tex. 87, at page 90:

"* * * The records of the state of Tamaulipas were destroyed in *1865*."

■ The plaintiffs and the defendants, respectively, have each asked for a summary judgment.

Section (c) of Rule 56 of the Federal Rules of Civil Procedure, having to do with Summary Judgments, provides as follows:

"(c) * * * The judgment sought shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that, except as to the amount of damages, *there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.*"

There are *many genuine issues of material facts* that prevent plaintiffs' recovery in this law suit.

There are *no genuine issues of material facts* that bar the defendants' recovery herein.

Therefore, it is the opinion and holding of the Court, that the motion of the plaintiffs for such judgment be denied, and that the motion of the defendants for summary judgment be granted.